UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------- X

REBECCA MONTESA, individually and as a parent and natural
guardian of EW, CW, and NW, infants, and as acting President of
the EAST RAMAPO PARENT TEACHER ASSOCIATION
COUNCIL; MARIE JEAN BAPTISTE, individually and as a
parent and natural guardian of PJB, DJB, and DJB, infants;
ISRAEL MEDIUA, individually and as a parent and natural
guardian of HM and YM, infants; MARC-E DORSANVIL,
individually and as a parent and natural guardian of MD and MD,
infants; MARTINE MARCISSE, individually and as a parent and
natural guardian of MM and DM, infants; RONALD
ROSEMOND, individually and as a parent and natural guardian
ALJ, infant; MARLENE and JUDITH ISRAEL, individually and
as parents and natural guardians of BCI and BI, infants; KERLINE
LOUIS, individually and as a parent and natural guardian of KL
and RL, infants; YOLENE HIPPOLYTE, individually and as a
parent and natural guardian of IH, IH, and RH, infants; MARIE
SOMISE LOUIS, individually; KRYSTAL WILSON, individually
and as a parent and natural guardian of ME, and EW, infants;
PAUL ROONEY, individually and as a parent and natural
guardian of DR, and JR, infants; NASIK ELAHI, individually and
as a parent and natural guardian of AE, infant; DONIQUE
JOHNSON, individually and as a parent and natural guardian of
DJ and DJ, infants; BETTY CARMAND, individually and as a
parent and natural guardian of JE, DE, and SL, infants; ROSENAY
and ELZA JACQUES, individually and as parents and natural
guardians of JJ, CJ, and AL, infants; LANA RHEUBOTTOM,
individually and as a parent and natural guardian of JR, infant;
HIRAM RIVERA, individually and as a parent and natural
guardian of AR, and TR, infants; STEVEN WHITE, individually;
EMILIA WHITE, individually; RAMONA JONES, individually
and as a parent and natural guardian of YJ, EJ, GJ, and TJ, infants;
WILMA GLOVER-KOOMSON, individually and as a parent and
natural guardian of FK, infant; YOLANDA WHITE, individually;
CHRISTOPHER AND DONNA MESIBOV, individually and as
parents and natural guardians of JM, and JM, infants; ALFRED
COLE, individually; ROBERT MALEBRANCHE, individually;
LORRAINE ALCIMAS, individually; IREUS REGINAL,
individually; EMMANUEL ALEXIS, individually; OVID
COLAS, individually; KIM FOSKEW, individually; LENTE
EUGENE, individually; LENARD BOUCHER, individually and
as a parent and natural guardian of WB and CB, infants; FRANKY
SAINVIL, individually; ADOLFINA MARTINEZ, individually

**VERIFIED
CLASS ACTION
COMPLAINT**

**JURY TRIAL
DEMANDED**

and as a parent and natural guardian of EVM, and CVM, infants;
MONESE THEODORE, individually and as a parent and natural
guardian of RT, infant; LANA AUGUSTE, individually and as a
parent and natural guardian of SA, infant; ANTHONY ORTA and
LILANA WILSON-ORTA, individually and as parents and natural
guardians of SW, and AO, infants; KIMBERLY ANNE
COLLICA, individually and as a parent and natural guardian of
RC, infant; MALLORY JOHNSON, individually; BEVERLY S.
JONES, individually and as a parent and natural guardian of TS,
infant; KENICE HIBBERT, individually and as a parent and
natural guardian of EP, infant; LITIA HAGANS, individually and
as a parent and natural guardian of DS and DC, infants;
BEVERLY PATTERSON WATSON, individually and as a parent
and natural guardian of JW, infant; FLAMBERT TELUSCA,
individually and as a parent and natural guardian of ST, infant;
ENELLE PIERRE, individually and as a parent and natural
guardian of KP, JP, and CP, infants; ANNE CARMAND-LUNDI,
individually and as a parent and natural guardian of AS and PL,
infants; LEVY CAZEAU, individually and as a parent and natural
guardian of TCL, infant; MARIE JOSY JEAN-BAPTISTE,
individually and as a parent and natural guardian of HJB, JJB and
JJB, infants; ANNIE CRUDOP, individually; JULIA
THOMPSON, individually; KENNETH ISAACS, individually;
PETER SHARPE, individually; FRANTZIE LAMARRE-CHAM,
individually and as a parent and natural guardian of MC, MC, and
MC, infants; DORIAN BUTCHER, individually and as a parent
and natural guardian of SB, infant; MARGARET TUCK,
individually and as a parent and natural guardian of JA, infant;
REGINALDA BRUNO, individually; RETTVLIE JOURDAIN
and TAISHA BAPVIOT, individually and as parents and natural
guardians of PD, infant; MARIA MARTINEZ-FLORES,
individually and as a parent and natural guardian of AMF, infant;
PEARLINE WRAY, individually and as a parent and natural
guardian of RM, infant; SHARON PARKER, individually and as a
parent and natural guardian of AP, infant; BOILEAU MEHU,
individually and as a parent and natural guardian of FM, CM, and
KM, infants; JEAN BERNADIN LAGUERRE and MARTHO
FERDINAND, individually and as parents and natural guardians of
WL and BL, infants; LAMARTINE LARAME, individually and as
a parent and natural guardian of LL, LL and LL, infants; ETHENE
LARAME, individually; PATRICK JEANBAPTISTE,
individually and as a parent and natural guardian of PJ JR., DJ, and
DPJ, infants; MARIE VERLAINE MATHELUS, individually and
as a parent and natural guardian of AM, infant; MARIE
AURELUS, individually and as a parent and natural guardian of
JA and CA, infants; JEAN-RENE VICSAMA, individually and as

a parent and natural guardian of RSV and FJV, infants;
LUCIENNE SAINT FORT, individually and as a legal guardian of
HR, DP and MP, infants; VELLA MARDY-ARRE, individually
and as a parent and natural guardian of RM, infant; RONY
JACQUES, individually and as a parent and natural guardian of
TRJ and MJ, infants; LISA ROSS, individually and as a parent and
natural guardian of DR, infant; LISA MEYERS, individually and
as a parent and natural guardian of SM, infant; GEORGES
HEROLD DELALEU, individually and as a parent and natural
guardian of CD, infant; BENITA GILES, individually and as a
parent and natural guardian of BG and BB, infants; PATRICIA A.
COLLINS, individually and as a parent and natural guardian of
JCM and JM, infants; DEMERUANT C. LOUISTHELMY,
individually and as a parent and natural guardian of DL, RL, and
MTL, infants; SERGO BEAUBOEUF, individually and as a parent
and natural guardian of MM, infant; JUNIE CLAUTAURE,
individually and as a parent and natural guardian of CC, and
JJO,CAROLD FORTUNE and ADELE FORTUNE, individually
and as parents and natural guardians of TF, infant; JOCELIN
NOEL, individually and as a parent and natural guardian of JN,
and EN, infants; ROLAND ALEXANDRE, individually and as a
parent and natural guardian of ZA, DA and EA, infants; PRESLER
LOUIS-JUSTE, individually and as a parent and natural guardian
of ELJ, and PLJ, infants; ANNA NARCISSE, individually and as a
legal guardian of JF and AM, infants; HARVEY WILLIAMS,
individually and as a legal guardian of JM and AM, infants;
JESULA AUGUSTE, individually; PIERRE DESROSIERS,
individually; JULIETTE JEAN KERNOSAINT, individually;
GEROLD ST. BRICE, individually; MICHELLE LARAME,
individually; JERISON LORA, individually; MAGDA
DESDUNES, individually; PATRICIA JOURDAIN, individually;
DESHAWN PARKER, individually; RUSSELL BISHOP,
individually; OSWALD DUBOIS, individually; COLIN GRANT,
individually; KENNETH BOLT, individually; CHRIS BIBBINS,
individually; JOANNE CHERIMOND, individually;
MELVERLEEN BULLOCK, individually; CLEAVON
BULLOCK, individually; JULIA THOMPSON, individually;
ROBERT JONES, individually; EDENS ZULOMÉ, individually;
REBECCA ADJEFEY, individually; RAYSHON RETTWAY,
individually; MAGDA PIERRE-LOUIS, individually; TATIANA
PIERRE-LOUIS, individually; MARLEE COMEAU, individually;
GERALD CHEREMEANT, individually; ARTHUR
MONDESTIN, individually; RAYSHON PETTWAY,
individually; SYBIL BEACH EDWARDS, individually and as a
parent and natural guardian of AE, infant; ANTONIO MIGUEL,
individually and as a parent and natural guardian of AMD, infant;

3

JUDITH DESIR, individually and as a parent and natural guardian of JMS, infant; VIERGELINE ENLUS, individually and as a parent and natural guardian of GJ and MJ, infants; NAJA WILSON, individually and as a parent and natural guardian of ET, ET and ET, infants; DYNAA LATURE, individually and as a parent and natural guardian of DD, infant; MINNIE WILSON, individually and as a parent and natural guardian of IW, infant; FAMILLA EPPS, individually and as a parent and natural guardian of JE, infant; PRUDENCE WRAY, individually and as a parent and natural guardian of NR and GM, infants; DONNA GARCES, individually and as a parent and natural guardian of NS, infant; INGRID RENER, individually and as a parent and natural guardian of BE, and AE, and LE, infants; ODNY EUGENE individually and as a parent and natural guardian of JE, infant; JEAN R. MARSEILLE, individually; JADIA DORCELLY, individually; BADIO DOSSELAINE, individually; ROBERT BADIO, individually; PIERRE LOUIS CYNILLE, individually; MURIELLE GUERIN, individually and as a parent and natural guardian of MG, infant; FERDILUS DIEUDONNE, individually and as a parent and natural guardian of, JF, CF, and AF, infants; ALINE TELUSCA, individually and as a parent and natural guardian of, FT and ST, infants; PAUL LARAME, individually and as a parent and natural guardian of, VT, infant; VALQUISE LOUIS JACQUES, individually and as a parent and natural guardian of ALJ, infant; MARIE ROSE MICHEL, individually; NADEGE DORCELLY, individually; MALLORY JOHNSON, individually and as a parent and natural guardian of, AL, infant; SERGO PIERRE, individually and as a parent and natural guardian of ASP, infant; CADET SAURAL, individually and as a parent and natural guardian of AS, infant; TONY MARSEILLE, individually and as a parent and natural guardian of EM, infant; MARIE LINDA LOUIS and JUDSON LOUIS, individually and as parents and natural guardians of SL, infants; YOLENE BONNY, individually and as a parent and natural guardian of APJ and PJ, infants; JULIA DERIVAL, individually and as a parent and natural guardian of SD and RD, infants; LINDA R. GILBERT, individually and as a parent and natural guardian of WG, DG, and JG, infants; DIEVLINE ST. GERMAIN, individually; MATHIE DIEJUSTE, individually; CLAUDE NADER DORCELLY, individually; MARIE LAFONTANTE, individually; LAGUERRE CICERON, individually; MARIE ROSE EXHAUTES, individually; DAPHKAR FLEURIS, individually; PEGGY FLOYD, individually and as a parent and natural guardian of SF; LOUIS WHARTON, individually; COURTNEY JOYCE, individually; BLANDINE LAROQUE, individually and as a parent and natural guardian of SM, infant; JOSEPH C.

CLERVEAUX, individually and as a parent and natural guardian
of CC, infant; JEAN JEAN CHARLES, individually and as a
parent and natural guardian of DJC, infant; MARIE NICOLE
DESCAS, individually and as a parent and natural guardian of ND
and SD, infants; EUGENIE EUGENE, individually and as a parent
and natural guardian of AR and AR, infants; CARMELLE M.
MEHU, individually and as a parent and natural guardian of FM,
CM, and KM, infants; U. JOSIE ALEXANDRE, individually and
as a parent and natural guardian of ZA, DA and EA, infants;
SHELOMITHE JEAN, individually; PATRICIA DESROCHES,
individually; DARLENE LAUTURE, individually and as a parent
and natural guardian of BL and AL, infant; RUTH ARCHANGE,
individually and as a parent and natural guardian of RL, RGL,
AND JGL, infants; EMMANUEL AUGUSTIN, individually and
as a parent and natural guardian of ELA, MLA, SA, and KA,
infants: BERTHANE ANTOINE, individually and as a parent and
natural guardian of BG and BG, infants; MARILA MONTILUS,
individually and as a parent and natural guardian of SM, infant;
MARK GRIFFITH, JR., individually; MEGHAN FITZGERALD,
individually; JUDY and MATT KARIUS, individually and as
parents and natural guardians of FK; on behalf of a class of
similarly situated persons, on behalf of themselves and on behalf
of the EAST RAMAPO CENTRAL SCHOOL DISTRICT; and the
EAST RAMAPO CENTRAL SCHOOL DISTRICT,

Plaintiffs,

–against–

DANIEL SCHWARTZ, YEHUDA WEISSMANDL, MOSES
FRIEDMAN, MOSHE HOPSTEIN, ELIYAHU SOLOMON,
NATHAN ROTHSCHILD, ARON WIEDER, MORRIS KOHN,
RICHARD STONE, ALBERT D'AGOSTINO, JOEL KLEIN,
and ELIEZER WIZMAN,

Defendants.

---------------------------------------------------------------------------X

Plaintiffs, by their undersigned counsel, as and for their petition allege as follows.

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiffs seek relief for Defendants'

violation of their right secured by the First and Fourteenth Amendments to the United States

5

Constitution, the Individuals with Disabilities Education Act (IDEA), the laws and Constitution of the State of New York, the New York State Education Law, and the common law. The Plaintiffs seek compensatory and punitive damages, prohibitory and affirmative injunctive relief, an award of costs and attorneys fees, and such other and further relief that the Court deems equitable and just. Plaintiffs allege that the defendants, who, in various combinations, have made up a majority of the Board of the East Ramapo Central School District, have engaged in numerous schemes to siphon off public money to support private religious institutions in various yeshivas, forcing a large cut in instructional programming in the public schools to a degree that the right of public school children to an education is impugned.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to the First and Fourteenth Amendments to the Constitution; jurisdiction is invoked pursuant to 42 U.S.C. 1983 and 28 U.S.C. §1331.

3.      The plaintiffs further invoke this court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case and controversy.

4.      Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C.A. § 1391(a).

## PARTIES

5.      The individual plaintiffs, who sue on behalf of a class of persons similarly situated and on behalf of the East Ramapo Central School District, are:

i.    Rebecca Montesa, President of the East Ramapo Parent Teacher Association Council, on behalf of and as a parent of a parent of EW, who attends Spring Valley High School, CW, who attends Chestnut Ridge Middle School, and NW, who attends Elmwood Elementary.

ii.   Patrick and Marie Jean Baptiste, who are parents of PJB, who attends Pomona Middle School, DJB, who attends Lime Kiln Elementary School, and DJB, who attends Grandview Elementary School.

iii.  Israel Mediua, who is a parent of HM, who attends Limekiln Elementary School, and YM, who attends Kakiat Elementary School.

iv.   Marc-e Dorsanvil, who is a parent of MD, who attends Spring Valley High School, and MD, who attends Chestnut Ridge Middle School.

v.    Martine Marcisse, who is a parent of MM and DM, who attend Kakiat Elementary School.

vi.   Ronald Rosemond, who is a parent of ALJ, who attends Lime Kiiln Elementary School.

vii.  Marlene and Judith Israel, who are parents of BCI, who attends Chestnut Ridge Elementary, and BI, who attends St. Joseph's High School.

viii. Kerline Louis, who is a parent of KL, who attends Ramapo High School, and RL, who attends St. Peter

ix.   Yolene Hippolyte, who is a parent of IH and IH, who attend Pomona High School, and RH, who attends Kakiat Elementary School.

x.    Marie Somise Louis, who is a parent of STL, who attends St. Peter.

xi.   Krystal Wilson, who is a parent of ME, who attends Summit Park Elementary School, and EW, who attends Pomona Middle School.

xii.   Paul Rooney, who is a parent of DR, who attends East Ramapo High School, and JR, who attends Pomona Middle School.

xiii.   Nasik Elahi, who is a parent of AE, who attends East Ramapo High School.

xiv.   Donique Johnson, who is a parent of DJ and DJ, who attend East Ramapo High School.

xv.   Betty Carmand, who is a parent of JE and DE who attend East Ramapo High School, and SL, who attends Hempstead Elementary School.

xvi.   Rosenay and Elza Jacques, who are parents of JJ, who attends Spring Valley High School, CJ who attends Chestnut Ridge Middle School, and AL who attends Fleetwood Elementary School.

xvii.   Lana Rheubottom, who is a parent of Jason Rheubottom, who attends East Ramapo High School.

xviii.   Hiram Rivera, who is parent of AR, who attends Kakiat Elementary School, and TR, who attends East Ramapo High School.

xix.   Steven and Emilia White, who are taxpayers and residents of Rockland County.

xx.   Ramona Jones, who is a parent of YJ and EJ, who attend Spring Valley High School, and GJ and TJ, who attend Elmwood Elementary School.

xxi.   Wilma Glover-Koomson, who is a parent of FK, who attends Pomona Middle School.

xxii.   Yolanda White, who is a taxpayer and resident of Rockland County.

xxiii.   Christopher Mesibov and Donna Mesibov, who are parents of JM, who attends Spring Valley High School, and JM, who attends Chestnut Ridge Middle School.

xxiv.   Alfred Cole, who is a taxpayer and resident of Rockland County.

xxv.   Robert Malebranche, who is a taxpayer and resident of Rockland County.

xxvi.   Lorraine Alcimas, who is a taxpayer and resident of Rockland County.

8

xxvii. Ireus Reginal, who is a taxpayer and resident of Rockland County.

xxviii. Emmanuel Alexis, who is a taxpayer and resident of Rockland County.

xxix. Ovid Colas, who is a taxpayer and resident of Rockland County.

xxx. Kim Foskew, who is a taxpayer and resident of Rockland County.

xxxi. Lente Eugene, who is a taxpayer and resident of Rockland County.

xxxii. Lenard Boucher, who is a parent of WB, who attends Pomona Middle School, and CB, who attends Lime Kiln Elementary School.

xxxiii. Franky Sainvil, who is a taxpayer and resident of Rockland County.

xxxiv. Adolfina Martinez, who is a parent of EVM, who attends Pomona Middle School, and CVM, who attends Summit Park Elementary School.

xxxv. Monese Theodore, who is a parent of RT, who attends East Ramapo High School.

xxxvi. Lana Auguste, who is a parent of SA, who attends Spring Valley High School.

xxxvii. Anthony Orta and Lilana Wilson-Orta, who are parents of SW, who attends Margetts Elementary School and AO, who attends Early Childhood Center.

xxxviii. Kimberly Anne Collica, who is a parent of RC, who attends Pomona Middle School.

xxxix. Kenice Hibbert, who is a parent of EP, who attends Grandview Elementary School.

xl. Litia Hagans, who is a parent of DS, who attends East Ramapo High School and DC who attends Elmwood Elementary School.

xli. Beverly Patterson Watson, who is a parent of JW, who attends Chestnut Ridge Middle School.

xlii. Flambert Telusca, who is a parent of ST, who attends Summit Park Elementary School.

xliii. Enelle Pierre, who is a parent of KP, who attends Kakiat Junior High School, JP, who attends Pomona Middle School, and CP, who attends Summit Park Elementary School.

xliv.   Anne Carmand-Lundi, who is a parent of AS, who attends Pomona Middle School, and PL, who attends Hempstead Elementary School.

xlv.   Levy Cazeau, who is a parent of TCL, who attends East Ramapo High School.

xlvi.   Marie Josy Jean-Baptiste, who is a parent of HJB, who attends Spring Valley High School, JJB, who attends Chestnut Ridge Middle School, and JJB, who attends Eldorado Elementary School.

xlvii.   Annie Crudop, who is a taxpayer and resident of Rockland County.

xlviii.   Kenneth Isaacs, who is a taxpayer and resident of Rockland County.

xlix.   Peter Sharpe, who is a taxpayer and resident of Rockland County.

l.   Frantzie Lamarre-Cham, who is a parent of MC, who attends Albertus Magnus High School, MC, who attends Pomona Middle School, and MC, who attends Kakiat Elementary School.

li.   Dorian Butcher, who is a parent of SB, who attends Chestnut Ridge Middle School.

lii.   Margaret Tuck, who is a parent of JA, who attends Ramapo High School.

liii.   Reginalda Bruno, who is a taxpayer and resident of Rockland County.

liv.   Rettvlie Jourdain and Taisha Bapviot, who are parents of PD, who attends Ramapo High School.

lv.   Maria Martinez-Flores, who is a parent of AMF, who attends Pomona Middle School.

lvi.   Pearline Wray, who is a parent of RM, who attends Ramapo High School.

lvii.   Sharon Parker, who is a parent of AP, who attends Ramapo High School.

lviii.   Jean Bernadin LaGuerre and Martho Ferdinand, who are parents of WL, who attends Elmwood Elementary School, and BL, who attends Margetts Elementary School.

lix.     Lamartine Larame, who is a parent of LL, who attends Ramapo High School, and LL and LL, who attend Karkiat Elementary School.

lx.      Ethene Larame, who is a taxpayer and resident of Rockland County.

lxi.     Marie Verlaine Mathelus, who is a parent of AM, who attends Hempstead Elementary School.

lxii.    Marie Aurelus, who is a parent of JA and CA, who attend Fleetwood Elementary School.

lxiii.   Jean-Rene Vicsama, who is a parent of RSV, who attends Spring Valley High School, and FJJV, who attends Ramapo High School.

lxiv.    Lucienne Saint Fort, who is a legal guardian of HR, DP and MP, who attend Spring Valley High School.

lxv.     Vella Mardy-Arre, who is a parent of RM, who attends Fleetwood Elementary School.

lxvi.    Rony Jacques, who is a parent of TRJ, who attends East Ramapo High School and MJ, who attends Kakiat Elementary.

lxvii.   Lisa Ross, who is a parent of DR, who attends Chestnut Ridge Middle School.

lxviii.  Lisa Meyers, who is a parent of SM, who attends Chestnut Ridge Middle School.

lxix.    Georges Herold Delaleu, who is a parent of CD, who attends Grandview Elementary School.

lxx.     Benita Giles, who is a parent of BG and BB, who attend Grandview Elementary School.

lxxi.    Patricia A. Collins, who is a parent of JCM, who attends Pomona Middle School, and JM, who attends Lime Kiln Elementary School.

lxxii.   Demeruant C. Louisthelmy, who is a parent of DL and RL, who attend Chestnut Ridge Middle School, and MTL, who attends Spring Valley High School.

lxxiii.  Sergo Beauboeuf, who is a parent of MM, who attends Elmwood Elementary School.

lxxiv. Junie Clautaure, who is a parent of CC, who attends Spring Valley High School, and JJO, who attends Fleetwood Elementary School.

lxxv. Carold and Adele Fortune, who are parents of TF, who attends El Dorado Elementary School.

lxxvi. Jocelin Noel, who is a parent of JN, who attends Kakiat Elementary School, and EN, who attends Prime Time Early Learning Center.

lxxvii. Roland Alexandre, who is a parent of ZA, who attends Pomona Middle School, and DA and EA, who attend Grandview Elementary School.

lxxviii. Presler Louis-Juste, who is a parent of ELJ and PLJ, who attend Ramapo High School.

lxxix. Anna Narcisse, who is a legal guardian of JF and AM, who attend Spring Valley High School.

lxxx. Harvey Williams, who is a legal guardian of JM and AM, who attend Chestnut Ridge Middle School.

lxxxi. Jesula Auguste, who is a taxpayer and resident of Rockland County.

lxxxii. Pierre Desrosiers, who is a taxpayer and resident of Rockland County.

lxxxiii. Juliette Jean Kernosaint, who is a taxpayer and resident of Rockland County.

lxxxiv. Gerold St. Brice, who is a taxpayer and resident of Rockland County.

lxxxv. Michelle Larame, who is a taxpayer and resident of Rockland County.

lxxxvi. Jerison Lora, who is a taxpayer and resident of Rockland County.

lxxxvii. Magda Desdunes, who is a taxpayer and resident of Rockland County.

lxxxviii. Patricia Jourdain, who is a taxpayer and resident of Rockland County.

lxxxix. DeShawn Parker, who is a taxpayer and resident of Rockland County.

xc. Russell Bishop, who is a taxpayer and resident of Rockland County.

xci.   Oswald DuBois, who is a taxpayer and resident of Rockland County.

xcii.   Colin Grant, who is a taxpayer and resident of Rockland County.

xciii.   Kenneth Bolt, who is a taxpayer and resident of Rockland County.

xciv.   Chris Bibbins, who is a taxpayer and resident of Rockland County.

xcv.   Joanne Cherimond, who is a taxpayer and resident of Rockland County.

xcvi.   Melverleen Bullock, who is a taxpayer and resident of Rockland County.

xcvii.   Cleavon Bullock, who is a taxpayer and resident of Rockland County.

xcviii.   Julia Thompson, who is a taxpayer and resident of Rockland County.

xcix.   Robert Jones, who is a taxpayer and resident of Rockland County.

c.   Edens Zulomé, who is a taxpayer and resident of Rockland County.

ci.   Rebecca Adjefey, who is a taxpayer and resident of Rockland County.

cii.   Rayshon Rettway, who is a taxpayer and resident of Rockland County.

ciii.   Magda Pierre-Louis, who is a taxpayer and resident of Rockland County.

civ.   Tatiana Pierre-Louis, who is a taxpayer and resident of Rockland County.

cv.   Marlee Comeau, who is a taxpayer and resident of Rockland County.

cvi.   Gerald Cheremeant, who is a resident and taxpayer of Rockland County.

cvii.   Arthur Mondestin, who is a resident and taxpayer of Rockland County.

cviii.   Beverly S. Jones, who is a parent of TS, who attends Spring Valley High School.

cix.   Sybil Beach Edwards, who is a parent of AE, who attends Pomona Middle School.

cx.   Antonio Miguel, who is a parent of AMD, who attends El Dorado elementary school.

cxi.   Judith Desir, who is a parent of JMS, who attends a school in the East Ramapo Central School District.

cxii.   Viergeline Enlus, who is a parent of GJ and MJ who attend Ramapo High School.

cxiii.    Naja Wilson, who is a parent of ET and ET who attend Ramapo High School and ET who attends Kakiet.

cxiv.    Dynaa Lature, who is a parent of DD, who attends Summit Park Elementary.

cxv.    Minnie Wilson, who is a parent of EW, who attends Grandview Elementary.

cxvi.    Familla Epps, who is a parent of JE, who attends Spring Valley High School.

cxvii.    Prudence Wray, who is a parent of NR, who attends Ramapo High School and GM, who attends the Early Childhood Center.

cxviii.    Donna Garces, who is a parent of NS, who attends a school in East Ramapo Central School District.

cxix.    Ingrid Rener, who is a parent of BE, who attends Pomona Middle School, and AE, who attends Kakiat Elementary, and LE, who attends Summit Park Elementary.

cxx.    Odny Eugene, who is a parent of JE, who attends a school in East Ramapo Central School District.

cxxi.    Jean R. Marseille, who is a taxpayer and resident of Rockland County.

cxxii.    Jadia Dorcelly, who is a taxpayer and resident of Rockland County.

cxxiii.    Badio Dosselaine, who is a taxpayer and resident of Rockland County.

cxxiv.    Robert Badio, who is a taxpayer and resident of Rockland County.

cxxv.    Pierre Louis Cynille, who is a taxpayer and resident of Rockland County.

cxxvi.    Murielle Guerin, who is a parent of MG, who attends East Ramapo High School.

cxxvii.    Ferdilus Dieudonne, who is a parent of JF, who attends East Ramapo High School, CF, who attends East Ramapo High School, and AF, who attends Lime Kiln Elementary School.

cxxviii.    Aline Telusca, who is a parent of FT, who attends Jesse Kaplan School, and ST, who attends Summit Park Elementary School.

cxxix.    Paul Larame, who is a parent of VL, who attends East Ramapo High School.

cxxx.    Valquise Louis Jacques who is a parent of ALJ, who attends Lime Kiln Elementary School.

cxxxi.    Marie Rose Michel, who is a taxpayer and resident of Rockland County.

cxxxii.    Nadege Dorcelly, who is a recent graduate of East Ramapo Central High School.

cxxxiii.    Mallory Johnson, who is a taxpayer and resident of Rockland County.

cxxxiv.    Sergo Pierre, who is a parent of ASP, who attends East Ramapo High School.

cxxxv.    Cadet Saural, who is a parent of AS, who attends East Ramapo High School.

cxxxvi.    Tony Marseille, who is a taxpayer and resident of Rockland County.

cxxxvii.    Marie Linda Louis and Judson Louis, who are parents of SL, who attends Chestnut Ridge Middle School.

cxxxviii.    Yolene Bonny, who is a taxpayer and resident of Rockland County.

cxxxix.    Julia Derival, who is a parent of SD, who attends East Ramapo High School, and RD, who attends Kakiat Elementary School.

cxl.    Linda R. Gilbert, who is a parent of WG and DG, who attend Margetts Elementary, and JG, who attends Early Childhood Center.

cxli.    Dievline St. Germain, who is a taxpayer and resident of Rockland County.

cxlii.    Mathie Dieujuste, who is a taxpayer and resident of Rockland County.

cxliii.    Claude Nader Dorcelly, who is a taxpayer and resident of Rockland County.

cxliv.    Marie LaFontante, who is a taxpayer and resident of Rockland County.

cxlv.    Laguerre Ciceron, who is a taxpayer and resident of Rockland County.

cxlvi.      Marie Rose Exhautes, who is a taxpayer and resident of Rockland County.

cxlvii.     Daphkar Fleuris, who is a taxpayer and resident of Rockland County.

cxlviii.    Peggy Floyd, who is a parent of SF, who attends a school in East Ramapo Central School
            District.

cxlix.      Louis Wharton, who is a recent graduate of East Ramapo Central School District.

cl.         Courtney Joyce Jasmin, who is a recent graduate of East Ramapo Central School District.

cli.        Blandine Laroque, who is a parent of SM, who attends Ramapo High School.

clii.       Joseph C. Clerveaux, who is a parent of CC, who will attend a school within East
            Ramapo Central School District.

cliii.      Jean Jean Charles, is a parent of DJC, who attends Spring Valley High School.

cliv.       Marie Nicole Descas, who is a parent of ND and SD, who attend Pomona Middle School.

clv.        Eugenie Eugene, who is a parent of AR and AR, who attend East Ramapo High School.

clvi.       Carmelle M. Mehu, who is a parent of FM and CM, who attend East Ramapo High
            School, and KM, who attends Summit Park Elementary School.

clvii.      U. Josie Alexandre, who is a parent of ZA, who attends Pomona Middle School, DA and
            EA, who attend Grandview Elementary School.

clviii.     Shelomithe Jean, who attends East Ramapo High School.

clix.       Patricia Desroches, who is a recent graduate of East Ramapo Central School District.

clx.        Darene Lauture, who is a parent of BL and AL, who attend Ramapo High School.

clxi.       Ruth Archange, who is a parent of RGL, who attends Pomona Middle School, RGL, who
            attends Kakiat Elementary and JGL, who attends Summit Park Elementary.

clxii.    Emmanuel Augustin, who is a parent of ELA, who attends Spring Valley High School,
MLA, who attends Chestnut Ridge Middle School, SA, who attends El Dorado
Elementary School, and KA, who attends Fleetwood Elementary.

clxiii.   Berthane Antoine, who is a parent of BG and BG, who attend Ramapo High School.

clxiv.    Marila Montilus, who is a parent of SM, who attends Spring Valley High School.

clxv.     Mark Griffith, Jr., as a taxpayer and resident of Rockland County.

clxvi.    Meghan Fitzgerald, as a taxpayer and resident of Rockland County.

clxvii.   Judy and Matt Karius, who are parents of FK, who attends East Ramapo High School.

6.       Plaintiff East Ramapo Central School District (the "District" or "ERCSD") is a
school districted created pursuant to Section 1805 of the New York State Education Law that
includes the public schools in the towns of Chestnut Ridge, New Hempstead, New Square,
Spring Valley, Airmont, Hillcrest, Monsey, and Pomona. The District is included as a necessary
party since the lawsuit, in part, seeks restitution from defendants to the District.

7.       Defendants are:

a.       Daniel Schwartz, who was a member of the Board during some or all of
the period between 2008 to present and is currently President of the East Ramapo Central School
District Board (the "Board"), a Board of Education authorized by Section 2503 of the New York
State Education Law to administer the District.

b.       Yehuda Weissmandl, who was a member of the Board during some or all
of the period between 2008 to present and is currently on the Board.

c.       Moses Friedman, who was a member of the Board during some or all of
the period between 2008 to present and is currently on the Board.

d.     Moshe Hopstein, who was a member of the Board during some or all of the period between 2008 to present and is currently on the Board.

e.     Eliyahu Solomon, who was a member of the Board during some or all of the period between 2008 to present and is currently to the Board.

f.     Nathan Rothschild, who was a member of the Board during some or all of the period between 2008 and present.

g.     Aron Wieder, who was a member of the Board during some or all of the period between 2008 and present.

h.     Morris Kohn, who was a member of the Board during some or all of the period between 2008 and present.

i.     Moses Friedman, who was a member of the Board during some or all of the period between 2008 and present.

j.     Richard Stone, who was a member of the Board during some or all of the period between 2008 and present.

k.     Albert D'Agostino, who was at all relevant times counsel to the Board. D'Agostino is an attorney at law licensed in the State of New York.

l.     Joel Klein, who at all relevant times was the Superintendent of Schools for the ERCSD.

m.     Eliezer Wizman, who at all relevant times was Assistant Superintendent Special Student Services & Funded Programs.

8.     Defendants are, and were at all times relevant herein, elected officers and agents of the ERCSD. Defendants are, and were at all times herein, acting under color of state law in the course and scope of their duties and functions as officers and agents of the ERCSD, and were

otherwise performing or engaging in conduct incidental to the performance of their lawful functions in the course of their duties, although in a manner which was *ultra vires*.

## CLASS ACTION ALLEGATIONS

9.      The individual plaintiffs are representatives of a class of parents whose children attend, or have since August 7, 2008 attended, a public school in the East Ramapo Central School District.

a.      The class is so numerous that joinder of all members is impracticable.

b.      There are questions of law and fact common to the class.

c.      The claims or defenses of the representative parties are typical of the claims or defenses of the class.

d.      The representative parties will fairly and adequately protect the interests of the class.

e.      The party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## STATEMENT OF RELEVANT FACTS

**A.      IN 2010 THE NEW YORK STATE EDUCATION DEPARTMENT AUDITED THE ERCSD AND WARNED THE BOARD THAT IT HAD INADEQUATE DOCUMENTATION SUPPORTING PRIVATE SCHOOL PLACEMENT OF STUDENTS QUALIFYING FOR SPECIAL EDUCATION.**

10.      In April 2010, staff from the New York State Education Department ("NYSED") Office of Special Education, Hudson Valley Regional Office of Special Education Quality Assurance ("SEQA") conducted a monitoring review "to ensure that the East Ramapo Central

School District's policies, procedures and practices regarding placement of students with disabilities were consistent with the requirements of federal and State laws and regulations."[1]

11.     The review was administered by examining district records including individual records of students with disabilities and by conducting interviews with the district's central office administration and special education staff. At the conclusion of the review NYSED found that, in 13 of 27 student records examined, the present level of performance statements in the students' individual education program ("IEP") lacked specificity and/or lacked information on how the disability affected involvement and progress in the general education curriculum, as required in section 200.4(d)(2)(i) of the Regulations of the Commissioner of Education.[2] In addition, the written notice provided to parents regarding Committee on Special Education ("CSE") IEP recommendations lacked the required components mandated in section 200.5(a)(3) of the Regulations of the Commissioner of Education.

12.     Additionally, where the IEP had been amended without a CSE meeting, prior written notice of the changes was not provided to parents as mandated in section 200.4 (g)(1) and 200.5(a) of the regulations of the Commissioner of Education.[3]

13.     SEQA also found private school placement files lacked sufficient documentation required when seeking State reimbursement, pursuant to section 200.6(j)(1)(iii) of the Regulations of the Commissioner of Education. These placement files specifically lacked documented efforts to place students in public facilities and to enable them to benefit from public instruction in less restrictive settings using special education services. The placement files also did not demonstrate the students' lack of progress in previously less restrictive public programs

---

[1] Ex. 1

[2] *Id.*

[3] The relevant regulations are annexed as Ex. 51

warranting the need for placement in a private school at public expense. Such placements, if done, unnecessarily cost the ERCSD hundred of thousands, if not millions of dollars per year.

14.     Given the aforementioned inadequacies, NYSED determined that the district engaged in a practice of placing students with disabilities in private schools when appropriate placements were available in public facilities. As such, the district was held to be non-compliant with the following sections of the Regulations of the Commissioner of Education: section 200.4(d)(2)(i), section 200.5(a)(3) and section 200.6(j)(1)(iii).[4]

15.     Given these findings, NYSED mandated that specific actions be taken which included:

a.      adoption of Compliance Assurance Plan which addressed each of the non-compliance issues, and which included a timeline that the non- compliance issues must be resolved.[5]

b.      utilization of technical assistance and professional development to assist Board of Education members, CSE members and special education staff to address the identified areas of non-compliance.[6]

c.      taking actions to address the lack of adequate documentation to support the need for placing students with disabilities in private schools when appropriate placements were available in public facilities.

i.      NYSED mandated that the CSE evaluate and revise the placement recommendations of the students placed in private schools that lacked the proper least restrictive environment documentation.[7]

---

[4] Ex. 1

[5] *Id.*

[6] *Id.*

ii.     NYSED stated they would no longer accept electronic applications

from ERCSD for State reimbursement pursuant to Education Law § 4405 for a student in an in-

state or out-of-state private school from East Ramapo.[8]

**B.    NYSED CONDUCTED A FOLLOW-UP MONITORING REPORT IN FEBRUARY 2012 FINDING CONTINUED NON-COMPLIANCE WITH STATE AND FEDERAL SPECIAL EDUCATION LAW.**

16.     On February 28 and 29, 2012, SEQA staff conducted a subsequent on-site follow-

up monitoring review of the East Ramapo School District to determine if the practices identified

as deficient during the April 2010 special education monitoring review had been successfully

changed.[9]

17.     After examination of both private school and public school student records, a

continued lack of adequate documentation was found. According to NY Education Law §

306(2), "[the] commissioner of education may also withhold from any district or city its share of

the public money of the state for willfully disobeying any provision of law or any decision, order

or regulation as aforesaid." NYSED determined that the District had failed to implement the

recommended practices to place students with disabilities in public facilities as required in

section 200.6(j)(1) of the Part 200 Regulations of the Commissioner of Education.[10]

18.     As a result, NYSED withheld reimbursement from the District for the cost of the

placement of students in approved private schools during the 2010-11 and 2011-12 school years,

causing a loss to the District's budget of, upon information and belief, millions of dollars.

NYSED will continue to withhold funds if the District refuses to comply with NYSED

---

[7] *Id.*

[8] *Id.*

[9] Ex 2

[10] *Id.*

recommendations.[11] Meanwhile, the ERCSD has paid millions of dollars to private schools for unwarranted special education placement.

19.     For the 2010-11 school year, the District placed 77 students with disabilities in private schools. 54 of these applications were submitted for State reimbursement and only 10% were approved. 38 did not contain the required documentation, and 6 were denied due to lack of justification for the approved private school placement. For the 2011-12 school year, the District placed 73 students with disabilities in private schools. 50 of these applications were submitted for State reimbursement; 31 were approved and 19 denied, again due to lack of justification for the approved private school placement.[12]

## C.     THE BOARD HAS ENGAGED IN A PATTERN OF SETTLING SPECIAL EDUCATION CASES AS A MEANS OF PLACING STUDENTS IN PRIVATE RELIGIOUS SCHOOLS, INCLUDING SCHOOLS OUTSIDE THE DISTRICT, AT EXORBITANT COSTS.

20.     Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, a child eligible for special education services receives an IEP, 20 U.S.C. § 1414(d), describing a set of goals for the child, a suggested placement where the children can receive the appropriate special education services.

21.     The CSE is a multidisciplinary team whose task is to make placement determinations. If a parent disagrees with a placement suggestion, the parent has the right to an Impartial Hearing. (See 20 U.S.C. § 1415.)

22.     If a parent chooses to place their child unilaterally in a private school placement, they will not receive tuition reimbursement from the state or the school district. (See 20 U.S.C. § 1412.)

---

[11] *Id.*

[12] *Id.*

23.     If a special education placement in a private school or out of district is approved

by the CSE or through an Impartial Hearing, Federal, State, and school district money may be

used to reimburse the district for tuition. (20 U.S.C. § 1411).

24.     If such placement is made through settlement without appropriate process and

findings and is not made by the CSE or through an impartial hearing, the district will be

responsible for the tuition without reimbursement.

25.     Over the past several years an increasing number of students eligible for special

education services in the ERCSD have been placed in nonpublic schools for the purported

purpose of providing required federal required services.[13]

　　　　a.     Upon information and belief these placements occurred because parents

wished placement in private yeshivas. Parents understood that pursuant to a policy adopted by

defendants while on the Board, they could simply write a letter stating they do not accept CSE

placement in a public school and request a specific placement with knowledge that it will be

granted without any question. Resolutions were then passed by the Board in lieu of an Impartial

Hearing. These placements included yeshivas known as Rockland Institute for Special Education

("RISE"), Kiryas Joel, and Hebrew Academy for Special Children ("HASC").

　　　　b.     Upon information and belief these settlements not only include district

payment of tuition, but also often include paying parent's attorneys fees.[14]

26.     When Defendants settled with parents prior to impartial hearings, no state

reimbursement is available for the private school tuition and it comes entirely out of district

---

[13] School Board meeting minutes for the academic years 2007-2008 through 2012-2013 reflect an increase in the number of special education settlements.

[14] Upon information and belief, attorney's fees have been approved for up to $30,000.

money. Defendants know that these settlements will not be available to the public under the New York Freedom of Information Law and are difficult for the public to challenge.

27.     Upon information and belief, appropriate public school placements were available and proposed by the CSE when the Board settled for private school placement.

28.     With respect to the placement by Defendants of students in RISE, a private religious school within the district:

        a.      Upon information and belief, most or all of the students placed in RISE were through the settlement process. No impartial hearings were held even though the CSE had made recommendations for appropriate placements in public schools. Placement in RISE were not approved by the state for reimbursement and were paid out of district money;

        b.      Upon information and belief IEP reports were changed in an attempt to gain CSE approval of the private school placement;

        c.      Several of the defendant Board members attempted to have the District assume administrative control of RISE and run the school as a public school, despite its direct connection with the Jewish faith. A letter sent to staff of RISE on January 10, 2011 assured them that they would be hired to work for the District and that teaching "cultural subjects" would be permissible.[15]

29.     In a Board meeting on May 2, 2009 the Board authorized the Superintendent of Schools, Joel Klein to sign an agreement regarding billing for services for Kiryas Joel, a public school within a religious community outside of the district.

        a.      In a Board meeting on July 2, 2009, the Board authorized a payment of $2,301,784.66 to Kiryas Joel for East Ramapo special education students sent out of District.

---

[15] Ex. 3.

      b.     Upon information and belief, Defendants specifically sent students to Kiryas Joel knowing they would receive religious teaching in a religious school operating under the guise of a public school.

      c.     Upon information and belief Defendants specifically picked Kiryas Joel so they would not have to wait for tuition reimbursement from New York State; they could pay the tuition directly out of district funds and would not be subject to an audit.

      i.     Defendants signed a Memorandum of Understanding ("MOU") setting a tuition rate of $74,000 per child, per year. This MOU is to be paid by ERCSD annually regardless of whether students actually attend Kiryas Joel.

      ii.     Upon information and belief, ERCSD paid Kirays Joel approximately $3 million dollars for tuition for 43 students in the 2010-2011.

      iii.     Upon information and belief, ERCSD paid Kiryas Joel approximately $4 million dollars for tuition for 56 students in 2011-2012.

      iv.     Upon information and belief, this amount will increase by $68-78 thousand per child for an additional 15 students for the 2012-2013 school year.

      d.     Upon information and belief, 13 of the students paid for by ERCSD in Kiryas Joel actually live in Kiryas Joel and are not residents of ERCSD.

      e.     The tuition rate for Kiryas Joel, a public school, exceeds the tuition of comparable private school placements.

      f.     There has been no showing at any time that the services provided in Kiryas Joel cannot be provided in the ERCSD.

      30.     Defendant Board Members placed students in private school placements through the settlement process with the help and guidance of Defendant D'Agostino, an attorney who

was hired to further the goal of promoting private religious schools with the utilization of public funds.

31.     Settlements have included sending students to schools not certified by New York State to issue diplomas.

     a.     Upon information and belief, a student requiring a high level of services was evaluated for the student's annual IEP. CSE made a recommendation that the student attend a Board of Cooperative Educational Service ("BOCES") funded program; however, the parent wrote a letter to district requesting residential placement.

     i.     Not enough documentation was provided as a support for residential placement, yet applications packets were sent out on the student's behalf by the District.

     ii.     When the student was accepted to a school out of state, the school required documentation that tuition would be paid for by New York State.

     iii.     Because proper documentation did not exist, Defendants wrote a promissory note to the school on the letterhead of Minerva & D'Agostino, P.C., that the district would pay for this out-of-state residential placement.

     iv.     The amount the district promised to pay for this unapproved placement was approximately $400,000, which included tuition, non-education services, aides, and transportation.

     v.     Upon information and belief, Defendant Board members, at D'Agostino's direction, directed the district to set aside this $400,000 out of the district's funds.

     vi.     Upon information and belief, Defendants knew the child would not be approved for reimbursement by the state when they promised to pay tuition.

        vii.     Upon information and belief, Defendants knew that the child was not a resident of ERCSD and was, instead, a resident of New York City.

        viii.    Upon information and belief the payment by District funds for approximately $400,000 was a considered by Defendant Board members to be a "gift."

**D.**    **DEFENDANTS CREATED AN ARRANGEMENT WITH RABBI JACOB HOROWITZ, EXECUTIVE DIRECTOR OF YESHIVA ASSOCIATION OF ROCKLAND COUNTY, AND EXECUTIVE DIRECTOR OF COMMUNITY EDUCATION CENTER, TO CONTROL THE DISTRIBUTION OF FEDERAL TITLE I FUNDING IN A MANNER WHICH FUNDS RELIGIOUS EDUCATION.**

32.     Title I funds are provided by the Federal Government for remedial services to help improve the academics of public and nonpublic students, "Title I, Part A (Title I) of the Elementary and Secondary Education Act, 20 U.S.C. § 6301 *et seq.*, as amended ("ESEA"), provides financial assistance to local educational agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards."[16]

33.     Title I funds are available to students in both private and public schools.[17] However, ESEA specifically states that funds are used for secular, neutral educational programs. Section 6320(a)(2) states, "(2) SECULAR, NEUTRAL, NONIDEOLOGICAL – Such educational services or other benefits, including materials and equipment, shall be secular, neutral, and nonideological."

34.     Section 6316(e)(9) further stresses the requirement that Title I funds are used for strictly secular purposes: "PROHIBITION – Nothing contained in this subsection shall permit the making of any payment for religious worship or instruction."

---

[16] 20 U.S.C. § 6301.

[17] 20 U.S.C. § 6320(a)(1).

35.     Section 6320(d)(2)(b) of the ESEA states, "(B) REQUIREMENT – In the provision of such services, such employee, individual, association, agency, or organization shall be independent of such private school and of any religious organization, and such employment or contract shall be under the control and supervision of such public agency."

36.     East Ramapo Central School Districts contracts with Community Education Center ("CEC"), a division of the Community Outreach Center ("COC"), both directed by Rabbi Jacob Horowitz ("Horowitz"), to provide services for private school children pursuant to Title I and Title III.[18] Horowitz is also the Executive Director of the Yeshiva Association of Rockland County ("YARC"), located at the same address as CEC and COC, 50 Melnick Drive, Monsey, New York 10952.[19]

37.     YARC is an association that promotes spiritual development and assists private religious schools, including enlightening them to "the various government programs and grants that are available for their benefit."[20] Upon information and belief this is an association of 42 private religious schools.

38.     The Certificate of Incorporation includes "religious" as one of four categories of "purposes" for which YARC is "organized exclusively" as a corporation.[21]

39.     Because of the above-stated affiliations between CEC, YARC, and Horowitz, the CEC is not independent from the private schools in which it provides the Title I services and is not independent of any religious organization.

40.     On December 16, 2009 defendants approved and authorized the Board President and Superintendent of Schools to sign the Agreement with Yeshiva Association of Rockland

---

[18] Ex. 4.

[19] Ex. 5.

[20] Ex. 6.

[21] *Id.*

County to provide after-school remedial service at Yeshiva Avir Yakov through the use of Title I funds. See Agreement – Yeshiva Association of Rockland County (YARC).[22]

41.     Upon information and belief, the agreement with YARC approved by defendants pays approximately a half-million dollars in ERCSD funds per year.

42.     Upon information and belief, the services provided by CEC pursuant to Title I and Title III do not include the required safeguards to ensure that government-funded services do not promote religion. The School District and CEC agreed to operate the program for Title I and Title II services "on site of the schools as indicated in [an] annexed list of schools."[23] Most of these schools are private religious schools. One school which receives remedial services is Yeshiva Darchei Noam.[24]

    a.     As reflected in a parent handbook for Yeshiva Darchei Noam, "The talmidim [students][25] of Yeshiva Darchei Noam are required to conduct themselves according to the guidelines of Torah [First five books of the Bible][26] and Yiddishkeit [Jewish Way of Life][27]."

    b.     In addition, the handbook states "all boys should be "chazering" (reviewing) their Limudei Kodesh studies on a regular basis as well."

    c.     Limudei Kodesh is the study of the "Torah, Hebrew Bible, Talmud, rabbinic literature and similar works, all of which are Judaism's religious texts. Ideally within Judaism it is done for the purpose of the mitzvah ("commandment") of Torah study itself."[28]

---

[22] Board meeting minutes December 16, 2009, *available at* http://www.eram.k12.ny.us/education/components/docmgr/default.php?sectiondetailid=38228&fileitem=8077&catfilter=1747 (last visited Aug. 6, 2012).

[23] Exhibit 4

[24] *Id.*

[25] Talmidim, *available at*, http://www.lightofmashiach.org/glossary.html (last visited on Aug. 6 2012).

[26] Torah means 'instruction' and refers to the books of Moshe – the 'law' comprised of the books: Genesis, Exodus, Leviticus, Numbers, and Deuteronomy. 'Torah' is also used loosely in traditional Judaism to mean all Jewish law, Scriptural and oral*, available at*, http://www.lightofmashiach.org/glossary.html (last visited on Aug. 6, 2012).

[27] Yiddishkeit, available at, http://en.wikipedia.org/wiki/Yiddishkeit (Last visited on Aug. 6 2012).

d.      The students also engage in davening, or reciting the prescribed liturgical

prayers.

43.      The New York State Office of Inspector General initiated an audit to determine

"whether expenditures for mentor/tutors under Title I, Part A of the Elementary and Secondary

Education Act of 1965, as amended, were allowable and in accordance with applicable laws,

regulations, and guidance; and whether non-salary expenditures for Individuals with Disabilities

Education Act (IDEA), Part B funds were allowable in accordance with applicable laws,

regulations, and guidance."[29] The Office of Inspector General closed the audit and indicated by

letter to Dr. Joel Klein, Superintendent of Schools, that the closure of the audit "does not

preclude the Department of Education from taking action concerning any aspect of the East

Ramapo Title I or IDEA program ... [and] should not be interpreted as agreement with or

endorsement of areas reviewed." The audit that was performed "was not extensive enough to

answer the objectives ... [or] would not necessarily disclose all material weaknesses in the areas

of [their] stated objectives."[30]

44.      Upon information and belief, in 2010, the District's auditors, Tobin and

Company, prepared a report about the funded programs and non public school support. (The

Board voted to start an RFP to replace the auditor, as they were "unhappy" with the quality of

their work.)

45.      Upon information and belief, the findings included the following;

a.      The district has not maintained adequate back up for how the per pupil

amount for Title 1 funding is calculated.

---

[28] Limudei_Kodesh, *available at,* http://en.wikipedia.org/wiki/Limudei_Kodesh (Last visited on Aug. 6, 2012).
[29] Ex. 8
[30] *Id.*

       b.      The English as a Second Language count used to calculate Title III funding allocation among schools is prepared by an external consultant and submitted on as an EXCEL report that can be easily altered.

       c.      There is no documentation to show that the board ever approved either the pupil allocation, or the amounts needed to fund both public and nonpublic schools.

46.      Upon information and belief, defendants have awarded a non competitive contract, in the amount of ten million dollars to a private individual, and his corporation, to manage federal programs in the non public religious schools. Upon information and belief this individual is Rabbi Jacob Horowitz and YARC.

47.      Given the above facts, defendants have rendered aid, utilizing federal funds, to schools under the control and direction of a Hasidic Jewish denomination, and in which the doctrines and tenets of Hasidic Judaism are taught with little, if any, financial criteria or control.

## E.    DEFENDANTS APPROVED OF AND/OR RATIFIED THE PURCHASE OF RELIGIOUS TEXTBOOKS WITH DISTRICT MONEY.

48.      Defendants, most particular Eliezer Wizman, have ordered or condoned the ordering of non-secular books that reflect or teach traditional values and stories rooted in the Jewish Faith. The purchase orders contain titles in violation of the U.S. Constitution and New York State Education Law.

49.      In purchase order FP11-05351[31], dated 6/16/2011, the ERCSD paid $3099.19 to Merkaz, Haseforim & Judaica for 102 different books.

       a.      The purchase order was requested by Eliezer Wizman.

       b.      All of the books listed on the purchase order have incomplete or inaccurate ISBN numbers.

---

[31] Ex. 9.

c.     Titles of the books ordered include:

i.     *The Embroidered Veil*, a story described as heightening the reader's understanding and feeling for Judaism.[32]

ii.    *5 Great Lives*, an examination of Rabbis Moshe Feinstein, Yaakov Kamenetsky, Yaakov Yisroel Kanievsky (the Steipler Gaon), Shlomo Zalman Auerbach. and Yehudah Zev Segal. The text is a suite of "carefully chosen anecdotes -- culled from interviews and a host of research" designed to "present their subjects as teachers, guides, and role models, aside from their greatness in Torah."[33]

iii.   *Why Weren't You Zisha and Other Stories*, an illustrated book about "some of the great Chassidic masters... the Baal Shem Tov, the Rebbe Reb Zisha, and Reb Pinchas of Koretz."[34]

iv.    *Hamalach HaGoel*, full title *HaMalach HaGoel and Other Bedtime Stories*, described by the publisher's website as "a book of timeless tales with Torah messages."[35] The Hebrew phrase in the title is derived from a traditional children's prayer, itself taken from Genesis 48:16.

v.     *Let My Nation Go*, a story about the Pesach miracle from slavery in Egypt.

vi.    *Let My Nation Live*, full title *Let My Nation Live: The story of the Jewish Deliverance in the Days of Mordechai And Esther*.

vii.   *I Keep Kosher*, a children's book about the rules of keeping kosher.

---

[32] *Id.*

[33] *5 Great Lives,* Artscroll.com, http://www.artscroll.com/Products/FIVH.html (last visited July 11, 2012).

[34] *Why Weren't You Zisha and Other Stories*, Artscroll.com, http://www.artscroll.com/Products/ZISH.html.

[35] *HaMalach HaGoel and Other Bedtime Stories,* Feldheim.com, http://www.feldheim.com/jewish-books-for-children/children/hamalach-hagoel-and-other-bedtime-stories.html (last visited July 11, 2012).

viii.   *Let's Go to Shul!*, an illustrated book meant to augment "appreciation for the laws of the synagogue."[36]

ix.   *Reb Moshe: the Life and Ideals of Hagaon, Rabbi Moshe Feinstein* – Feinstein was an internationally renowned Orthodox rabbi and a widely considered authority on Jewish law.

x.   *5 Great Leaders*, full title *5 Great Leaders: R Chaim Ozer Zensky, R Meir Shapiro, R Yosef Chaim Sonnenfeld, R Eichonon Wasserman, The Chazon ish*, by Rabbi Shimon Finkelman

50.   In purchase order BD12-02199,[37] dated 8/5/2011, The East Ramapo Central School District paid $3,217.00 to Merkaz Jaseforim & Judaica for two sets of textbooks:

a.   "Machanayim Books –Yiddish" – these books are in Yiddish, describing "miracles and faith."

b.   The check number for this purchase is 332323, and the description of the purchase is listed only as "textbooks and workbooks." Complete and accurate ISBN numbers are not included in the purchase order.

c.   The purchase order contains a disclaimer stating "do not send any books that violate NYS textbook/library law. Only materials that are secular in nature can be accepted." Yet, the entire purchase order is for non-secular texts.[38]

d.   In purchase order BD12-01867,[39] dated 11/25/ 2011, the East Ramapo Central School District paid $4,302.40 to Bais Rochel Books. No ISBN numbers are provided on the purchase orders and purchase orders are in English and in Yiddish.

---

[36] *Let's Go to Shul!*, Feldheim.com, http://www.feldheim.com/jewish-books-for-children/young-readers/let-s-go-to-shul.html (last visited July 11, 2012).
[37] Ex. 10
[38] See Ex. 11

51.     Upon Information and belief, numerous other purchase orders contained purchases of non-secular books for the yeshiva.

## F.   DEFENDANTS HASTILY APPROVED THE SALE OF THE HILLCREST SCHOOL AND USED FRAUDULENT APPRAISALS IN AN ATTEMPT TO SELL THE BUILDING TO RELIGIOUS SCHOOLS UNDER MARKET VALUE.

52.     On April 19, 2010, Board members Hopstein, Solomon, Kohn, Rothschild and Wieder voted to close Hillcrest Elementary School ("Hillcrest") and deem its building and grounds surplus property, and appraise the property in contemplation of selling or leasing it.[40]

53.     A first appraisal, by Valuation Plus, Inc of Mamaroneck NY, was received in May 2010 and it valued the Hillcrest building at $5.9 million.[41]

54.     On June 8, 2010, the Board, including Defendants Hopstein and Solomon, authorized the issuance of a request for proposals ("RFP") for the sale or lease of the Hillcrest building.[42]

55.     An RFP was issued on June 16, 2010 and advertised only in a local newspaper, the Journal News, and the district's website.

56.     The Board received three bids for Hillcrest, for $1.65 million, $4.6 million, and $3.1 million. The latter bid came from the Congregation Yeshiva Avir Yakov ('Congregation').

57.     The Board authorized its attorney, defendant Albert D'Agostino, to obtain a second appraisal ("second appraisal") "in view of the discrepancy between the range of bids and the first appraisal."[43]

---

[39] Ex. 10

[40] Ex. 12

[41] *Id.*

[42] *Id.*

[43] Board Meeting Minutes, July 28, 2010, *available at,*
http://www.eram.k12.ny.us/education/page/download.php?fileinfo=MjAxMDA3MjhfLV8wNy0yOC0xMC1yZWWct

58.     The second appraisal, by Appraisal Group International of Parsippany NJ, was received on July 26, 2010. Hillcrest was valued at $3.24 million.

59.     Hillcrest's value "was estimated by the Town of Clarkstown assessor at $11 million,"[44] but the Board accepted the Congregation's bid at a price of $3.1 million[45] on July 28, 2010.

60.     Robert A. Forrest, CREA Senior Appraiser made an assessment of Hillcrest and concluded that the fair market value was of 13.9 million.[46]

61.     The bids were only accepted for less than a month and the RFP was advertised purely locally.

62.     The second appraisal for $3.24 million was based upon comparable sales of property a significant distance from the location of Hillcrest.

63.     The "Comparable Sale #2" used by the second appraisal references Document Number 27785 and indicates a property that is a three story building with a site size of $0.77\pm$ Acres and a sale price of $1,900,000; however, records of the Town of Ramapo, where the sale was located, indicate "Land Only."[47]

64.     This sale was appealed by plaintiff Steven White to the New York State Commissioner of Education.

65.     On August 31, 2010 the Commissioner granted interim relief prohibiting the sale of Hillcrest pending a final decision and permitted the Board to lease Hillcrest to Congregation. The Board voted to lease Hillcrest to Congregation on October 20, 2010.

---

bXRnLW1pbnV0ZXMucGRmOjo6L3d3dy9zY2hvb2xzL3NjL3JlW90ZS9pbWFnZXMvZG9jbWdyLzE5NzJma
WxlOTE1NS5wZGY=&sectiondetailid=38228 (Last visited on Aug. 6, 2012).

[44] Ex. 13; *See also* Ex. 14.

[45] Ex. 14

[46] Ex. 15.

[47] Ex. 50

66.     On June 6, 2011 the Commissioner halted the sale. The Commissioner could not conclude that the method of sale that the Board utilized was "apt to bring in the best price for Hillcrest."[48] In addition, the Commissioner was unable to conclude that the Board "carefully considered each appraisal and taken reasonable steps to reconcile them in a rational manner."[49]

67.     Upon information and belief, there is a special relationship of school board members Aron Weider, Moshe Hopstein, Richard Stone, Eliyhu Solomon, and Morris Kohn with New Square Community. They are referred to as "Our own candidates from within the community in the village of New Square."[50] Yeshiva Avir Yakov resides in New Square. Hillcrest Elementary is directly adjacent to New Square.

68.     Upon information and belief, the undervalued appraisals were solicited to support a below market value sale price to support defendants' personal interest and special relationships with Congregation and not to support the best interest of the public school district.

69.     Although the Commissioner of Education invalidated the board's decision to sell Hillcrest to Congregation, the board again voted to lease Hillcrest to Congregation on August 29, 2011 for one year.[51] The lease provides "for a right of first refusal to purchase the property and with options to extend the lease for four (4) successive one (1) year terms."[52]

---

[48] *Appeal of White*, 50 Ed Dept Rep, Decision No. 16,239.

[49] *Id.*

[50] *Slate of stealth candidates resude to provide information to voters in East Ramapo School Board Elections*, http://www.preserveramapo.org/Preserve%20Ramapo%202009/slate_of_stealth_candidates_refu.htm (Last visited on Aug. 6 2012)

[51] Ex. 16, at 6868.

[52] *Id.*

G.   **DEFENDANTS ATTEMPTED TO SELL COLTON ELEMENTARY SCHOOL FOR BELOW MARKET PRICE AND FAILED TO ENFORCE THE TERMS OF THE EXISTING LEASE.**

70.   On April 4, 2009 the Board decided to lease Colton Elementary School[53] and on April 22, 2009 decided to engage the services of an appraiser, Valuation Plus.[54] Bids were opened on May 1, 2009 and on May 6, 2009, the Board accepted a bid from the Hebrew Academy for Special Children, Inc. ("HASC") and Congregation Bais Malka ("Bais Malka").[55] The Board approved the Lease Agreement and Rider with Bais Malka and HASC to lease the Colton Elementary School on July 15, 2009.[56]

71.   The aforedescribed lease was undervalued and no real effort was made to locate a lessor at market value.

72.   The lease of The Colton Elementary School to the HASC and Bais Malka is for five years, from August 1, 2009 through July 31, 2014.[57]

73.   Upon information and belief, the last lease payment by Bais Malka was on or about November 1, 2011.[58] Since then, partial monthly lease payments have been repeatedly made, and even these partial payments made have been late.[59]

74.   Upon information and belief, as March 1, 2012, approximately $85,360.24 in unpaid rent is due to the district from Bais Malka.[60]

---

[53] Ex. 17.

[54] Ex. 17

[55] Ex. 18

[56] Ex. 19.

[57] Ex. 12, at 1.

[58] Ex. 11 (Although there are copies of checks from Bais Malka to ERCSD, including two partial lease payments dated 12/14/2011 and 1/27/2012, these have not been included in the Invoice/Credit History).

[59] *Id.*

[60] *Id.*

75.     In addition, the Invoices sent and the ERCSD Invoice/Credit Memo History, do not reflect a three percent increase as required pursuant to the Rider to the Lease.[61]

76.     Upon information and belief, on March 17, 2010, the Board authorized an independent appraisal of Colton School and the appraisal estimated the value of the property as $6,800,000.

77.     Upon information and belief, on or about February 28, 2011, the same appraisers conducted another appraisal of Colton which resulted in an appraisal value of $6,600,000.

78.     The Board members Friedman, Hopstein, Kohn, Solomon and Weissmandl voted on May 25, 2011 to sell Colton to Bais Malka and HASC for $6.6 million.[62] No RFP had been issued, but the parties signed a Contract of Sale.[63] The Contract of Sale was conditioned on the Seller's right to issue a request for proposals ("RFP") to offer the property for sale to the general public.[64]

79.     Board Members Young-Mercer and Price voted against the sale of Colton to HASC and Bais Malka on May 25, 2011.[65]

80.     After the decision to sell, an RFP was issued on June 1, 2011, "in order to try to solicit higher bids," and bids were to be opened on July 27, 2011.[66]

81.     Under the terms of the RFP, Colton Elementary School would be sold subject to the existing lease and upon information and belief, a prospective bidder would not know about

---

[61] Ex. 20 at 7 paragraph 20 ("Late charges of 3% of the unpaid rent shall be added to the rent for rental payments that are made after the 30th day of the month.); *See also, Id.* at 6 (monthly rent payments to be $63,235.63).

[62] Ex. 21, at 6802.

[63] Ex. 22.

[64] Ex. 22, at 6.

[65] *Board Meeting Minutes, July 28, 2010, available at,* http://www.eram.k12.ny.us/education/page/download.php?fileinfo=MjAxMDA3MjhfLV8wNy0yOC0xMC1yZWct bXRnLW1pbnV0ZXMucGRmOjo6L3d3dy9zY2hvb2xzL3NlbW90ZS90ZS90ZS9pbW90ZS9jbWdyLzE5NzJma WxlOTOTE1NS5wZGY= (last visited July 12, 2012).

[66] Ex. 23.

the late payments of the current tenants, HASC and Bais Malka, because the Board has hidden this fact.

82.     However, the Superintendent, defendant Joel Klein, was quoted in the Journal News on May 27, 2011 that Colton would be sold at the assessed price of $6.6 million dollars to Bais Malka and HASC.[67]

83.     On June 6, 2011, the Board refused to release any appraisals despite a FOIL request.[68]

84.     The Town of Ramapo Real Property Assessment lists Colton's market value as $11,966,758 as of July 1, 2010."[69]

85.     Upon information and belief, "in order to sell a property in Rockland County it would be much more efficacious to advertise repeatedly in newspapers of local circulation such as the Rockland Journal News as other local sellers routinely do. I believe that owners know this when marketing property and I assume that the Board knew this as well." (Para. 3, Meyers Affidavit, annexed hereto as Exhibit 52.)

86.     Upon information and belief, an RFP was published in the legal notices section of the local newspapers and not in the real estate advertising section which is where potential users and commercial purchasers of a facility such as the property would be likely to look for properties or see the availability of this property.[70]

87.     Upon information and belief, "a New York State real estate broker was engaged to further market the property. However, the real estate broker who was engaged is based in Valley Stream, New York where defendant Attorney D'Agostino is based … [N]o reasonable real estate

---

[67] Ex. 24; Ex. 25, at 2-3.

[68] Ex. 26.

[69] Ex. 25 paragraph 7.

[70] Ex. 52, ¶3.

seller ... would hire a broker in Nassau County to sell a property located in Rockland County, nearly 100 miles away. Upon information and belief, the retained real estate broker is not familiar with the Rockland County market or business community and would not be particularly qualified by associations or contacts to effectively sell property in Rockland County."[71]

88.     At no time did the Board's efforts to sell the property focus at all on the local market for a buyer, and a serious effort was not made to market the property for the highest and best price.

89.     Upon information and belief, one appraisal of Colton was done by Valuation Plus, Inc. Valuation Plus had appraised another school property, Hillcrest, which sale was stopped by the State Education Commissioner. Valuation Plus identified a reasonable marketing time to be 9-18 months. Here, the Board signed a Contract for Sale before an RFP was issued and the marketing time was for only 8 weeks.

90.     The value shown by the Valuation Plus appraisal was not properly taken into consideration by the board members.[72]

91.     On May 27, 2011, A public statement by the Superintendent, Joel Klein, that Colton would be sold to Bais Malka and HASC confuses potential bidders and sends a message that the decision to sell was already made.

92.     Preferential treatment has been given to HASC and Bais Malka by accepting partial lease payments and failing to collect an increase in rent.[73]

93.     The Contract for Sale "gives... preferences and an unfair advantage in the bidding process" to HASC and Bais Malka.[74]

---

[71] Ex. 52, ¶5.

[72] Ex. 25, at 3.

[73] Ex. 27 at 7 paragraph 20 "late charges of 3% of the unpaid rent shall be added to the rent for rental payments that are made after the 30th day of the month."

a.       Credits in the Rider to the Contract includes $36,000 for "repair and replacement of the electrical system,"[75] a $100,000 maximum for "replacement of the Asphalt areas,"[76] $250,000 for any necessary remediation for the removal of asbestos,[77] and an undetermined amount (as of June 17, 2011) for the "granting of a resolution of subdivision by the Planning Board of the Incorporated Village of New Hempstead, which subdivision application shall be submitted and processed in diligent fashion by and at the sole cost and expense of the Seller."[78]

b.       The infrastructure and/or facilities have been improved with expenditures of $881,437 since 2001 by the District.[79]

c.       Handwritten notes in the contract state that the Board "will give credit of rent payments (from July 1, 2011) forward towards purchase price as soon as the contract becomes unconditional. This credit is not in the initial lease contract," and amounts to an interest free loan to HASC and Bais Malka.[80]

**H.   DEFENDANTS WERE FOUND BY THE STATE COMPTROLLER TO HAVE FAILED TO PROPERLY TRACK ACCOUNTS RECEIVABLE, MAINTAIN PROPER PROCUREMENT CONTROL, AND PROPERLY TRACK THE DISTRIBUTION OF TEXTBOOKS.**

94.    The Office of the New York State Comptroller conducted an audit of the ERCSD examining the period from July 1, 2008 through April 13, 2010.[81]

---

[74] Ex. 25, at 9.

[75] Ex. 20, at 2.

[76] Ex. 20 at 2.

[77] *Id.* at 3.

[78] Ex. 22, at 13.

[79] Ex. 28.

[80] Ex. 25, at 7; (handwritten notes).

[81] Ex. 29.

95.     In many instances the Comptroller was unable to obtain requested information due to the District's failure to implement its policies, failure to employ appropriate practice, and unresponsiveness.

96.     The Comptroller found that "[t]he Board, along with District officials, failed to fulfill its stewardship, oversight, and leadership responsibilities when it failed to establish a proper control environment, implement its own adopted policy, and establish policies and procedures required by sound business practices. The deficiencies exposed District funds and assets to abuse, waste and/or loss."[82]

97.     The Comptroller confirmed that "the Board and District officials failed to adopt and enforce policies and procedures required by sound business practices and, most importantly, failed to set a good example for District employees to follow."[83]

98.     The Comptroller found three areas of concern: health insurance premium reimbursement, procurement, and textbook distribution.

99.     Among other issues, according to the Comptroller, the Board failed to establish a procedure governing health insurance payments resulting in a period of improper enrichment of Board members with knowledge of such impropriety.

a.     Participants in the District's health insurance plan must "pay their portion of their monthly insurance premiums to the District one month in advance."[84] "The District then pays the insurance carriers on behalf of the participants using the moneys collected."[85] There is no provision for payments by the District for non-paying participants.

---

[82] Exhibit 29, at 3.

[83] *Id.* at 8.

[84] *Id.*

[85] *Id.*

b.     In addition to a very informal process for all participants regarding reimbursements, the District staff did not apply the same "procedures" to Board members as they did to the other health insurance plan participants. The "process" for participants other than Board members consisted of issuing late notices that included the date their insurance would be terminated and subsequently canceling insurance after two to three months of nonpayment (a period during which the District paid the premiums). However, of the 40 late notices sent to three Board members, none included termination dates and no member's insurance was terminated after three months of non-payment.

c.     The Director of Human Resources had knowledge of these occurrences and, upon information and belief, at Defendants' direction, directed the benefits clerk not to include specific termination language that was standard for all other participants.[86]

d.     The Director of Human Resources was aware of this scheme since May 2009 and informed Superintendent Klein. Allegedly, the Superintendent reached out to the Board members to resolve the situation; however, nothing came out of these efforts.[87]

e.     The Comptroller investigated payments owed by the Board President and the President's response that he had other coverage; however, the "[d]istrict officials were unable to provide [the Comptroller] with the Board President's original health insurance policy with the second provider to substantiate his claim.[88]

---

[86] Ex. 29, at 9

[87] *Id.*

[88] Ex. 29, at 10.

f.   Although the District has since obtained all health insurance premiums owed, their past failure to reimburse the District was found by the Comptroller as an "indication of impropriety and improper enrichment at taxpayers' expense.[89]

100.   The Comptroller also found that the Board lacks professional contracts and failed to obtain professional services with the "best interest of the taxpayers, in the most prudent and economical manner, and without favoritism."[90]

a.   In addition to health insurance premium reimbursement, the Comptroller addressed the District's procurement of services. The District, per protocol, maintains a procurement policy, yet does not utilize it. Instead, it repeatedly fails to enter into written agreements for professional services.[91] This does not ensure the District and taxpayers that District hired professionals are being fairly compensated for services rendered. Two professionals did not have a written agreement indicating "the services to be provided or the basis for compensation," yet the District paid them $495,023.[92] The District sought, after the comptroller's review, to excuse their failure to enter into these agreements by noting that the Comptroller did not find that these "professionals did not perform the services for which they were paid or that the payments they received were somehow improper."[93] However, the failure to enter into a written agreement made it impossible to measure whether payments were proper.

---

[89] Ex. 30, at 3; Ex. 29, at 10

[90] Ex. 29.

[91] Ex. 29, at 11.

[92] *Id.*

[93] Ex. 29, at 5.

b.      Even when the District had a written agreement with a professional (an exterminator), the Comptroller deemed the $10,289 payment to be inconsistent with the agreement detailing an hourly rate for services because the payment was based on a flat rate.[94]

c.      In addition to the failure of ensuring adequate services and payments by entering into written agreements with professional service providers, as required, the Comptroller found "that the District did not use competition to procure professional services by soliciting proposals via Requests for Proposals or written quotations for professionals."[95] The Comptroller noted the importance of "assur[ing] taxpayers that they are obtaining services in the best interest of the taxpayers, in the most prudent and economical manner, and without favoritism."[96] (Emphasis added).

d.      Although the District acknowledges that professional services must "be procured in a manner so as to ensure the prudent and economical use of public monies in the best interests of the taxpayers," the District continues to maintain the services of Attorney Albert D'Agostino at two times the fees of the Board's previous counsel.[97]

101.    The Comptroller also found that the Board lacked essential procedures for ensuring textbooks are accounted for and appropriately distributed.

a.      The Comptroller was unable to conduct a full and thorough audit due to the unavailability of textbook inventory records from nonpublic schools, despite the fact that the District maintains a policy, Board Policy No. 1740,[98] that requires a nonpublic school to maintain

---

[94] Ex. 29, at 11-12.

[95] Ex. 29, at 12.

[96] *Id.*

[97] Ex. 29, at 5 (citing Board Policy No. 6700-R).

[98] Ex. 31

an inventory of textbooks on loan from the District.[99] As a result, these requested records were never provided to the Comptroller. "District officials allowed this to happen because they failed to enter into written agreements to compel the nonpublic administrators to provide the records."[100]

102.    Mismanagement has led to the inequitable distribution of textbooks. Upon information and belief, various public schools do not receive the proper allocation of textbooks.[101]

103.    According to the Plan of Corrective Action, the Board outlined various policies that would be implemented in this area. Upon information and belief, to date, these textbook policies have not been implemented.

## I.   DEFENDANTS HAVE REPEATEDLY VIOLATED THEIR POLICIES GOVERNING THEIR FINANCIAL OBLIGATIONS.

104.    The Board continues to fail in "implement[ing] its own adopted policy, and establish policies ... required by sound business practices."[102] The Board has failed in this attempt by violating and failing to enforce the following policies:

a.    Board Policy No. 1740 states that " [t]he nonpublic school shall maintain an inventory of textbooks belonging to the District... and return those books to the District when they are no longer used by the nonpublic school."[103] The Board's actions are in direct violation of this policy. Furthermore, the Board has failed to amend the aforementioned policy in accordance with the State Comptroller's Plan of Corrective Action which explicitly requires "a random physical inspection of nonpublic school textbooks to be reconciled against the District's own

---

[99] Ex. 30, at 6; Ex. 31.

[100] Ex. 29, at 13.

[101] East Ramapo Principal Pat Simmons, *available at*, http://www.youtube.com/watch?v=6tuM_5Zmnsg&feature=relmfu (last visited on Aug. 6 2012) ; and see N.Y. Educ. Law s 701(4).

[102] Ex. 29 at 3.

[103] Ex. 31.

inventory of textbooks on loan to those schools."[104] In addition, an agreement "to maintain on-site the necessary records for textbooks on loan including student information, parent request, textbook inventory and their location" is required. If such amendments were made they have not been published pursuant to State laws and regulations.

      b.     Board safety policy 5450 requires that "[t]he safety of students shall be assured through close supervision of students in all school buildings and on school grounds and... special attention given to the maintenance of a safe school environment."[105] Nevertheless, the Board has opted to reduce the number of assistant principals in addition to numerous other practices that imperil the safety of students on school grounds are in contradiction to this stated policy.

      c.     Board Policy No. 6700-R states that professional services must "be procured in a manner so as to ensure the prudent and economical use of public monies in the best interests of the taxpayers."[106] As evidenced by the Comptroller's Audit, the Board has violated this policy and continues to do so in an egregious manner by currently employing the services of Attorney Albert D'Agostino. In 2010-2011 the budget reflected $457,616 for legal fees[107]; in 2011-2012, $455,000[108]; in 2012-2012, $600,000.[109] To date, Attorney D'Agostino has been paid by the District $1,276,033.30 (November 2009 through June 2012).[110]

      d.     Board Policy No. 2560 relating to the payment of health insurance premiums states, "[t]he benefits clerk shall promptly remit bills...and shall collect the

---

[104] After an exhaustive search of the Board's website, no amendment to Board Policy 1740 was found.

[105] Ex. 32.

[106] See Ex. 33.

[107] Ex. 34

[108] Ex. 35.

[109] *Id.*

[110] Total paid was compiled by Minerva & D'Agostino, P.C. invoices from November 2009 through June 2012.

premiums...in a timely fashion,"[111] from Board members. A practice has been adopted by the board, which is inconsistent with the above-stated policy, the Board has allowed late payments of premiums and when applicable did not terminate the insurance of Board members who disregarded the aforementioned policy; the board has similarly allowed late lease payments for tenants of Colton despite the lease agreement provisions.[112]

        e.      Board Policy No.6900 states, " Each year, a determination shall be made of which equipment,[and] supplies are obsolete...and [f]ollowing approval by the Board of Education items may be sold..."[113] The Clerk at the Depository has failed to obtain prior approval from the requisite authority prior to disposing books that were considered obsolete. This action amounts to a substantial violation of this policy. In addition, the Board has not amended and subsequently published the required changes to the aforementioned policy pursuant to the Comptroller's Audit Recommendation and Corrective Action Plans.

105.    Superintendent of Schools Defendant Joel Klein has stated, "We have policies. We have procedures. We have a staff. Under the Corrective Action Plan, we'll review our policies, our procedures and make changes if needed. But as far as we can determine, we are following the letter of the law."[114] The Superintendent's statement acknowledges the existence of Board policies, and distinguishes acting in accordance with "the letter of the law."[115]

106.    The Board has not amended and published changes to policies pursuant to the Comptroller's Audit Recommendation and their own Corrective Action Plans. This includes the development of "procedures and standards for written agreements for professional services. The

---

[111] See Ex. 36.

[112] Ex. 20, at 13, paragraph 31 and at 6-7 paragraph 20

[113] See Ex. 37

[114] East Ramapo Klein does his Pinocchio act, *available at,* http://www.youtube.com/watch?v=rlPOMWOOxdc, Sept. 8, 2011, (Last Visited on July 12,2012).

[115] *Id.*

standards [should have] require[d] written contracts for amounts less than $5,000 and more detailed written contract for amounts greater than $5,000."[116]

107.    Additionally, in 2010 the Office of the State Comptroller included East Ramapo in an audit of nine school districts to determine "whether school districts are procuring special education professional services for the best value."[117] The dates of the audit were from July 1, 2008 through August 31, 2009.

108.    The Comptroller determined that the ERCSD spent $206,000 on contracted special education professional services, hiring seven professionals for the period examined.

109.    The audit recognized that General Municipal Law does not require competitive bidding for professional services, however, in the audit it was determined that ERCSD spent $13,000 more on these contractual services than the lowest hourly rate.[118]

a.    For Physical Therapy services for the academic school year 2008-09 and 2009-10 ERCSD paid providers a rate of $65 to $140 an hour.

b.    For audiology services for the academic school year 2008-09 and 2009-10 ERCSD paid providers a rate of $113 to $117 an hour.

110.    A follow-up letter from the Comptroller's office stated, "By not seeking competition for these services, District Officials do not have adequate assurance that they procured these services in the most economical manner and in the best interest of the District's taxpayers. In addition, District officials were unable to provide documentation of how the vendors for these services were determined, as required by GML."[119]

---

[116] Ex. 30

[117] Ex. 38

[118] *Id.*

[119] Ex. 39

111.   The Letter continues, noting that the Board did not follow their own purchasing regulations: "While the District complied with the GML requirement to develop specific procedures for the procurement of professional services, we noted that the District did not advertise for or issue RFPs for special education professional services as required by the District's own purchasing regulations.[120]

**J.   DEFENDANTS HIRED ATTORNEY D'AGOSTINO AT DOUBLE THE PRICE OF THEIR PRIOR ATTORNEY WITH THE INTENT TO FURTHER THEIR SCHEME OF PROMOTING PRIVATE RELIGIOUS SCHOOLS AT TAXPAYER EXPENSE.**

112.   Until late 2009, the school attorney for ERCSD was Stephen Fromson of the firm of Greenberg, Wanderman & Fromson.

113.   Upon information and belief, for his services as school attorney, Mr. Fromson charged ERCSD $120 per hour.

114.   On November 18, 2009, a motion was made by then-Board-member Aron Wieder to replace Mr. Fromson with defendant Attorney Albert D'Agostino, Esq. of the firm of Minerva & D'Agostino, P.C.[121]

115.   Then-Superintendent of Schools, Dr. Ira E.Oustatcher, presented the ERCSD with an estimated cost of the services of D'Agostino which ranged between $600,000 to $1.3 million per year.[122]

116.   This estimate prompted inquiry from Board member Stephen Price regarding the cost the District would incur, given that the estimated cost of D'Agostino's services presented by Dr. Oustatcher was twice the then current cost of $325,000.[123] Board Member Calhoun also

---

[120] *Id.*

[121] Ex. 40

[122] East Ramapo part 6, *available at*, http://www.youtube.com/watch?v=RgN_2wFGd2o&feature=relmfu (Last visited on Aug. 6, 2012).

[123] *Id.*

expressed similar concerns, and urged Defendants to adhere to the "enormous [fiduciary] responsibility," that the District has to the public.

117.   In response, Defendant Solomon rejected Dr. Oustacher's evaluation that the District would incur such a high cost. When asked to provide an estimate, Defendant Solomon said, "... I believe it's not going to cost that much," and declined to provide an approximate cost.[124]

118.   Dr. Oustatcher urged the Board to re-evaluate the impact that D'Agostino's services would have on the District's budget.

119.   Then-Board member Calhoun urged Defendants to consider that such a decision cannot be based simply on the whims of an assumption, and that it would be "totally irresponsible" to do so.

120.   Nevertheless, the Defendants who were then on the Board disregarded Dr. Oustatcher's advice, and arbitrarily voted to approve the hiring of Albert D'Agostino as General Counsel for the East Ramapo School District.

121.   Attorney D'Agostino had previously gained a reputation for representing the Board of Education of the Lawrence Union Free School District, a district where the Board majority consisted of Orthodox Jews whose children attended private yeshivas.[125]

122.   While serving as counsel to the Lawrence Board, Attorney D'Agostino devised a novel way to use public money to fund special education in private religious schools,[126] similar to that described above.

---

[124] *Id.*

[125] Peter Appleboom, Board's Hiring Sets Off a School War, The New York Times, December 6, 2009, http://www.nytimes.com/2009/12/07/nyregion/07towns.html (Last visited on, Aug. 2012).

[126] See *Id.*

123.    Evidently, the motion to appoint Attorney D'Agostino was sudden and unexpected. The subject of changing school attorneys was never put on the Board's agenda prior to the November 18 meeting, nor was any special meeting called in advance to discuss the matter.[127]

124.    Some members of the Board were not informed prior to the meeting that Minerva & D'Agostino, P.C. had submitted a proposal for services to the Board, as they had to be informed of the name of the firm and the contents of the proposal at the November 18 meeting.[128]

125.    D'Agostino proposed to serve as school attorney in exchange for a $40,000 per year base retainer, with all work billed at a rate of $250 per hour, and travel billed at a rate of $125 per hour.

126.    Attorney D'Agostino's office is in Valley Stream, Nassau County, while the Administration offices of ERCSD are located in Spring Valley, Rockland County. Travel between the two locations takes more than one hour each way. In other words, any services Attorney D'Agostino performed would cost more than double what Mr. Fromson charged, and if Attorney D'Agostino had to be present for any Board business, the Board agreed to pay him over $250 simply to travel to the meeting.

127.    The reasons for appointing Attorney D'Agostino to the position of school attorney were discussed secretly in Executive Session over the objections of Board members Price and Young-Mercer and then-Board-member Calhoun.[129] Defendants Hopstein, Kohn, and Solomon

---

[127] Ex. 40, at 6416

[128] See *Id.*

[129] *Id.* at 6416

53

voted to convene into the Executive Session and were present at the three-hour Executive Session.[130]

128.    Upon the Board's return to Open Session, Defendants Hopstein, Kohn, and Solomon with then-Board-members Wieder and Stone, again over the objections of Members Price and Young-Mercer and then-member Calhoun, voted to retain Attorney D'Agostino as school attorney.[131]

129.    The Board members who were aware of Minerva and Attorney D'Agostino's proposal for services did not request or receive proposals from any other attorneys or law firms at the time they made their initial decision to retain Attorney D'Agostino as School District attorney.[132]

130.    Soon after Attorney D'Agostino was appointed as School District attorney, an appeal to the Commissioner was filed, challenging the appointment. At a special meeting on December 1, 2009, the Board voted to hire the firm of Kuntz, Spagnuolo & Murphy to represent the Board in the appeal.[133]

131.    At its regular meeting on December 2, 2009, members of the public were permitted to address the Board regarding Attorney D'Agostino's appointment. Eight parents and four students spoke in opposition to the move to appoint Attorney D'Agostino, compared with only one parent speaking in favor of the move.[134]

---

[130] See *Id.*

[131] *Id.* at 6417.

[132] *Appeal of White*, 50 Ed Dept Rep, Decision No. 16,239; Ex. 29.

[133] Ex. 41, at 6419.

[134] Ex. 42, at 6422.

132.    During this meeting, an altercation between Attorney D'Agostino and a parent was caught on video.[135] The video is available for viewing on the internet at www.youtube.com/watch?v=74T0j_X6-HM. When this parent criticized Attorney D'Agostino for charging too high a fee and for his "checkered past," Attorney D'Agostino became intemperate and stated, "I am putting this gentleman on notice,"[136] "You will be the subject of a lawsuit," [137] and "You want to speak to me outside?"[138] Attorney D'Agostino then approached the parent and can be seen on the video yelling inaudible remarks at the parent and making aggressive hand gestures[139] until he is physically led away from the parent by a security official.[140]

133.    At this meeting, the Board voted to put Attorney D'Agostino's appointment "on hold" until the resolution of the appeal concerning the appointment.[141]

134.    As noted by the Commissioner in Appeal of White, the Board issued a request for proposals for the position of school attorney on January 8, 2010. On February 1 and 2, 2010, the Board met in executive session to review the 11 proposals it received[142] and to interview candidates for the position of School District attorney.[143]

135.    On February 3, 2010, a majority of the Board (Hopstein, Kohn, Stone, and Weider) again voted to retain Attorney D'Agostino as School District attorney, despite the

---

[135] Antonio Luciano, *available at*, www.youtube.com/watch?v=74T0j_X6-HM (Last visited Aug. 6, 2012).

[136] See *Id.*

[137] See *Id.* at 1:28.

[138] See Id. at 1:37.

[139] See *Id.* at 2:15.

[140] See *Id.* at 2:22.

[141] Ex. 42, at 6425.

[142] Ex. 43, at 6455.

[143] Ex. 44, at 6457.

increase in cost, despite the altercation in December, and over the objection of members Price, Young-Mercer, Calhoun and Rothschild.[144]

136.    In sum, when the decision was made to appoint Attorney D'Agostino, no explanation was offered as to the reason for switching school attorneys; some members of the Board were never informed of the fact that their fellow members had been negotiating with Attorney D'Agostino to provide legal services to the Board; those Board members who were informed, including Defendants Hopstein, Kohn, and Solomon, sought Attorney D'Agostino out specifically, and did not request bids from any other attorneys; despite Attorney D'Agostino's higher price; the resounding community opposition to his appointment; the apparent lack of a need for a new school attorney, and Attorney D'Agostino's shocking display of intemperance in the face of criticism that occurred right before the Board's eyes, defendants Hopstein, Kohn, and Solomon (along with others no longer on the Board) voted to appoint him as school attorney.

137.    During Attorney D'Agostino's tenure at East Ramapo, the Board has been increasingly "settling" challenges to CSE placements by allowing Hasidic children to be placed in private yeshivas at public expense, even though public facilities would appropriately satisfy their needs.[145]

138.    The hiring of Attorney D'Agostino was an act to further of a plan by Defendants Hopstein and Solomon to provide benefits to private religious schools at public expense. Defendants Hopstein and Solomon approved the appointment of Attorney D'Agostino solely because they believed that, because of his prior record in Lawrence, New York, of developing

---

[144] Ex. 45, at 6461.

[145] School Board meeting minutes for the Academic years 2007-2008 through 2012-2013, reflect an increase in the number of special education settlements. See also Ex. 2 and Ex. 46

methods to fund yeshivas using special education money,[146] he would be complicit in a scheme to send Hasidic children requiring special education to East Ramapo area yeshivas at public expense, under the guise of a special education settlement, despite a lack of proof that public resources were unavailable. Attorney D'Agostino has been, in fact, complicit in such a scheme. The act of hiring Attorney D'Agostino thus evinces an intent to violate the law and the First Amendment.

## K.   ERCSD BOARD MEMBERS HAVE ENACTED BUDGET CUTS IN AN ARBITRARY AND UNINFORMED MANNER.

139.   Over the last several years, the ERCSD School Board has made cuts to the District budget due to a decline in resources available to the public schools. However, the process has been consumed by confusion and a lack of understanding by Board members

140.   The school budget cuts are unclear for the public and even Board members. Joanne Thompson, former board member, has stated that when she was on the Board (through the 2011-12 academic year), there was not enough information provided to make decision of what to cut.[147]

141.   During one Board meeting,[148] Stephen Price, a current non-defendant Board member, was confused over what budget cuts were being proposed and stated that if you study purchase orders, you will find millions of dollars you think you have in the bank but have already spent and that the budgets do not match.

a.   "I don't know what I am expected to evaluate, to put in front of the voters." This was stated only two weeks before the final budget was scheduled to be adopted. Price continues to talk about not having a draft of the budget and stated that the budget schedule

---

[146] See discussion at 120-122, *supra*.

[147] http://www.youtube.com/watch?v=ZJitiW3Yw_w&feature=bf_next&list=PL3E2ED9106E846F77 (Last visited Aug. 6, 2012).

[148] http://www.youtube.com/watch?v=1J4vX7Dsufs&feature=autoplay&list=PL3E2ED9106E846F77&playnext=1 (Last visited Aug. 6, 2012).

posted on the web site and adopted by board resolution, was supposed to be given to them on February 15th, which was the prior week. Price desperately stated to the Board, "I've been begging for information. You know it is true. Everyone on the board knows it to be true... begging for months for information. ... Everyone comes here, these people want to know about the education of their children and we are not answering any of their questions."[149]

      b.    Board President Schwartz brushed off his concerns and asked what Price proposed to cut. Price responded that he cannot tell what he should cut because he has not been given a copy of the budget yet. Schwartz responded that he would cut graduation because it is a superfluous expense.[150]

      c.    Board member Joanne Thompson then questioned the Board regarding the budget: "Where do we get to the point we can see line by line what this cut means... educationally, right now they are just numbers on a page."[151]

142.    Upon information and belief, defendants did not have a full understanding of the programs that they were cutting.

      a.    Upon information and belief, in 2009, when asked by a parent why the program Students with Interrupted Formal Education ("SIFE") was cut, one defendant replied, "What is SIFE?"

      b.    Upon information and belief, in April 2012, a parent asked then Board President, Morris Kohn, why the Board was considering making special education cuts for public school students. Kohn replied that they were not making special education cuts and this parent had to explain to him that the Collaborative Classes (which were being cut) were special

---

[149] *Id.*, at 11 minutes.

[150] *Id.*, at 12 minutes.

[151] *Id.*, at 15 minutes.

education classes. Kohn did not know what the Collaborative Classes were and this parent had to explain them to him.

143.    Defendants did not demonstrate accurate and effective financial planning. According to Comptroller DiNapoli, the projected 2010 year-end fund balance was grossly miscalculated and was without support.[152] There was no documentation provided showing how the projection was arrived at and no explanation for the inaccuracy of the projected fund balance. "The failure of District officials to project an accurate fund balance resulted in available resources not being used for the benefit of the taxpayers." Defendants "failed to project an accurate fund balance and ... failed to produce any documentation to indicate that a reasonable effort was made to do so."[153]

144.    Upon information and belief, in 2010 Defendants inappropriately adopted a budget that they expected the community to reject and which they urged the community to reject.[154] This caused confusion for the public and raised the question of whether the Board was truly acting in the best interests of the District.

145.    Proposed budget cuts discussed at Board meetings are general and vague, causing parents and even Board members to be unable to evaluate whether a program proposed to be cut is an educational or a non-mandated program. When asked when more information was to be provided, the then Board chair stated that the information would be provided at time of the vote, leaving Board members no time to assess the programs and their value.[155]

---

[152] Ex. 29, at 15

[153] *Id.*

[154] http://www.youtube.com/watch?v=7bzy56fg8kg&feature=relmfu (Last visited on Aug. 6, 2012).

[155] School Board - Mismanagement and Cuts for 2012-2013, *available at*, http://www.youtube.com/watch?v=1J4vX7Dsufs (Last visited Aug. 6, 2012).

**L.    DEFENDANT ERCSD BOARD MEMBERS MADE MANY ARBITRARY CUTS DENYING PUBLIC SCHOOL STUDENTS, WHO ARE MAINLY BLACK AND HISPANIC, A SOUND BASIC EDUCATION.**

146.    As religious school related spending has increased over the last few years, spending on the public schools has decreased. In order to fund their unlawful diversion of public resources to the yeshivas and religious education, the defendants have significantly cut spending on programs fundamental to the operation of the public schools in the ERCSD.

147.    On or before June 2010, former ERCSD Board Member Mimi Calhoun, at her last scheduled meeting, expressed sincere concerns that the district is in a "sad" state. Mrs. Calhoun stated that "East Ramapo had a single minded determination to understand what factors really make a positive impact on the students in our district."[156] She continued:

   a.    "And now, within the short span of the past two years, those programs are all being destroyed. We have seen smaller communities removed from our high schools. Middle school teams have been abolished. This board stripped away our instructional facilitators. This board increased classroom sizes in the elementary schools – and now is about to increase them again. This board has just done away with department chairs, and possibly some of our very best teachers."

   b.    "You seem to have been elected to fulfill a very narrow and targeted agenda."[157]

   c.    The Board has terminated their legal counsel without disclosing the reasons.

   d.    "[You have] caused our director of special education to resign."

   e.    "You have chosen to be trustees of a public schools system of which you have no or little background experience."[158]

---

[156] http://www.youtube.com/watch?v=LY2PiK6-CAM&feature=relmfu (Last visited on Aug. 6, 2012).

[157] *Id.*, at 2:00.

148.    Upon information and belief, defendants have made cuts which touch the at heart of a basic education, sometimes unnecessarily. For the academic year 2011-12, the budget's BOCES allocation for <u>management</u> information services was reduced to $376,120[159] from $666,120[160]. In addition, the District's summer school program at the middle school level was completely eliminated, although the District had projected a fund balance of $13,153,000 from the previous budget. Moreover, the District's audited financial statement showed a fund balance of $17, 793,047, $4.6 million more than was projected.

149.    Upon information and belief, over the past two years, the ERCSD has laid off 25% of its teachers, eliminated full-day kindergarten, eliminated school social workers, eliminated assistant principal slots, reduced collaborative special education classes in the high schools and middle schools to only classes that result in a Regents Exam, cut BOCES training programs, cut the Twilight Academy and increased class size.

150.    Upon information and belief, public school students no longer received an appropriate allocation of textbooks.[161]

151.    The East Ramapo School District is in a state of fiscal and educational decline. In the 2011-12 academic year, nine public schools were deemed as schools in need of improvement (SINI) by the State and several students were forced to obtain, and pay for an adequate education out of the District.

---

[158] *Id.*, at 3:23.

[159] Ex. 35, at 5.

[160] Ex. 34, at 9.

[161] http://www.youtube.com/watch?v=6tuM_5Zmnsg&feature=autoplay&list=PL3E2ED9106E846F77&playnext=1 (Last visited on Aug. 6, 2012). (Pat Simmons, a school principal, talks about cuts to textbooks stating that her school did not have enough textbooks that year. She also discusses how cutting assistant principals will affect the safety of the school and describes a code; See. http://www.youtube.com/watch?v=KEJty5Md5sM&feature=plcp (Last visited on Aug. 6, 2012) (Parent speaks out. Her daughter has to share textbooks; there are not enough papers).

152.    Upon information and belief, for the 2012 school year, the District received $47.5 million in State aid, an increase of $2 million from the previous year, and $30 million in federal aid, and proposed a tax levy increase of 1.91%, which, according to the State's new property tax cap, could have increased to 4.8%.

153.    Despite this increase in revenue, the adopted 2012-13 $192 million budget decreased spending on the public schools by $7 million, and cut more than $12 million in essential staff and programs.

154.    Once the Board has put the 2012-13 Budget into effect, the Board will have eliminated all social workers, assistant principals, guidance counselors, and collaborative classes, in addition to all elementary middle, and High School ESL support specialists, and the full-day kindergarten program.

155.    Draconian cuts were made to the Boards of Cooperative Educational Services (BOCES), which provide services such as vocational-technical programs for high school students intended to ensure that such students receive an adequate education.

156.    A 25% cut has also been made to several of the District's most significant extracurricular programs, including sports. In addition, there has been a 50% cut in the District's elementary band and orchestra instrumental lessons.

157.    The District, however, did not reduce spending on transportation to non-public schools on non-mandated days, which would have saved $490,000, more than the elimination of middle school deans (a $207,000 savings) and the reduction of sports ($213,000) combined.[162]

---

[162] Ex. 48

158.    The cumulative effect of these arbitrary cuts has resulted in a significant increase in general education class sizes, and a significant decrease in the number of sections in Advanced Placement and Honors courses for the 2012-13 academic year.

159.    The District has created a "public perception that the District may not be acting in the best interests of all students."[163] There have been numerous "reports of growing tension, distrust, and anger being expressed at board meetings and in the community" and "many African American and Latino parents [whose children make up over 90% of the students in the District's public schools] have lost confidence in the East Ramapo school district."[164]

## M.    THE DEFENDANTS HAVE SEGREGATED NON-WHITE STUDENTS FROM WHITE STUDENTS IN SPECIAL EDUCATION PROGRAMS.

160.    Currently, non-white students and students of non-American heritage compromise approximately 90% of the East Ramapo public schools. Non-white students and students of non-American heritage only compromise approximately 32% of the students residing in the ERCSD.

161.    Defendants' practice of assigning white children purportedly needing special education services to private schools while keeping all non-white children and children of Hispanic heritage in the East Ramapo public schools has resulted in substantial separation of white children of American heritage from non-white children and children of non-American heritage among schools in the ERCSD.

162.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs in each of the Causes of Actions set forth below.

---

[163] Ex. 49

[164] *Id.*

## AS AND FOR A FIRST
## CAUSE OF ACTION

### (DEPRIVATION OF RIGHTS UNDER THE FIRST
### AMENDMENT TO THE UNITED STATES CONSTITUTION)

163.    By the aforedescribed actions, including but not limited to the scheme to improperly place special education students in yeshivas in violation of the IDEA and the State Education Law, the ordering of religious text books, the contract to provide Title I services to yeshiva students through a religious organization, the efforts to sell school buildings to religious institutions for a cost below market value, the failure to collect rent from religious institutions renting school property, the failure to keep inventories of textbooks loaned to religious schools, the retention of Albert D'Agostino, and the diversion of tax payer funds in other ways to religious schools, defendants, acting under the color of law, without lawful justification, intentionally and with a deliberate indifference to and a reckless disregard for the natural and probable consequences of their acts, caused injury and damage to plaintiff District and to the individual plaintiffs and the class they represent, in violation of plaintiffs' Constitutional rights and guaranteed under the First Amendment to the Constitution of the United States.

## AS AND FOR A SECOND
## CAUSE OF ACTION

### (DENIAL OF FEDERALLY GUARANTEED EQUAL PROTECTION)

164.    As described above, defendants conspired to negotiate and accept unreasonable special education placement "settlements," which allowed Hasidic students to receive tuition reimbursement for attendance at private religious schools.

165.    Defendants also spent District money on religious textbooks for use in private religious schools that, under the law, should never have been bought by the District.

166.    The substantial and unnecessary increase in the cost of tuition reimbursement and textbook costs for private religious education has put a strain on the District's finances, and has resulted in severe budget cuts to important programs throughout the East Ramapo public schools.

167.    Defendants committed the above-alleged acts with intent to benefit Hasidic families only, all of whom are Caucasian.

168.    Defendants acted with deliberate indifference to the effects of their conspiracy to benefit Hasidic families on non-Hasidic school children within the District, particularly Black and Hispanic school children.

169.    Defendants acted under color of state law in the commission of the above-alleged acts.

170.    Defendant D'Agostino conspired with individuals acting under color of state law in the commission of the above-alleged acts.

171.    By their above-alleged acts, Defendants denied Plaintiff parents' children equal protection of the laws on the basis of religion, race, color, and national origin, in violation of the Fourteenth Amendment to the United States Constitution.

## AS AND FOR A THIRD
## CAUSE OF ACTION

### (DENIAL OF NEW YORK STATE GUARANTEED EQUAL PROTECTION)

172.    By the acts alleged in paragraphs 161-169 above, Defendants denied Plaintiff parents' children equal protection of the laws as guaranteed by Article I, §11 of the New York State Constitution.

### AS AND FOR A FOURTH
### CAUSE OF ACTION

### (DELIBERATE SCHOOL SEGREGATION – 20 U.S.C.§ 1703)

173.   Defendant Board is an educational agency as defined in 20 U.S.C. §1720(a).

174.   Defendants deliberately agreed and acted so as to allow white children of non-Hispanic heritage to attend private religious schools at the District's expense, while not making similar arrangements for non-white and Hispanic children.

175.   Defendants did so with the intent to segregate white children of American heritage from non-white children and/or children of Hispanic heritage.

176.   Defendants' actions did directly and proximately cause the schools attended by non-white children and/or children of Hispanic heritage to be substantially separate from schools attended by white children of American heritage.

177.   By its above-alleged actions, Defendant Board deliberately segregated the East Ramapo School District on the basis of race, color, and national origin, and did thereby deny Plaintiff parents' children equal educational opportunity, in violation of 20 U.S.C. §1703.

### AS AND FOR A FIFTH
### CAUSE OF ACTION

### (UNCONSTITUTIONAL GIFT OF PUBLIC FUNDS)

178.   Defendants have given public money and in-kind aid to private schools without consideration to the District.

179.   By their above-alleged acts, Defendants have caused Plaintiffs' tax money to be rendered to private schools as an unconstitutional gift of public funds, in violation of Article VIII, §1 of the New York State Constitution.

**AS AND FOR A SIXTH
CAUSE OF ACTION**

**(DEPRIVING CHILDREN OF THEIR RIGHT TO SOUND BASIC EDUCATION
IN VIOLATION OF ARTICLE XI, § 1 AND § 3 OF THE NEW YORK STATE
CONSTITUTION AND 20 U.S.C.A. § 1221-1)**

180.   Article XI, Section 1 of the New York State Constitution states: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of the state may be educated." This provision creates an entitlement to an education for New York children.

181.   It has been recognized by the New York State Court of Appeals that children have a constitutional right to the opportunity for a sound basic education.

182.   The inappropriate allocation and spending of District money led to significant cuts in public school education spending. The cuts include, but are not limited to, a significant decrease in the amount of advanced classes, teachers, guidance counselors, and the elimination of assistant principals, decreases in BOCES programs, elimination of extracurricular activities such as art and music, and the SIFE program.

183.   Congress has declared, at 20 U.S.C. § 1221-1: "Recognizing that the Nation's economic, political, and social security require a well-educated citizenry, the Congress (1) reaffirms, as a matter of high priority, the Nation's goal of equal educational opportunity, and (2) declares it to be the policy of the United States of America that every citizen is entitled to an education to meet his or her full potential without financial barriers."

184.   Additionally, Article XI, §3 of the New York State Constitution states, "Neither the state nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the

control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning."

185.    As a result of defendants' actions as aforedescribed, educational opportunities have been cut for public school students, while private schools continue to receive illegal District support. Defendants have dramatically cut important programs within the District in order to fund the unlawful religious activities complained of in the preceding paragraphs incorporated herein.

186.    Defendants have demonstrated deliberate indifference to duty to provide s sound education to Plaintiffs' children and the class they represent.

### AS AND FOR A SEVENTH CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

187.    Under New York State law, a fiduricary relationshwip exists between each board member and the schools in the district.

188.    "Among other things, school boards are responsible for educational standards, budget matters, management issues and health and safety. In carrying out these duties, individual board members have a fiduciary obligation to act constructively to achieve the best possible governance of the school district."[165]

189.    Each member of a board of education of a school district must complete training on "financial oversight, accountability and fiduciary responsibilities of a school board member," (N.Y. Educ. Law § 2102-a.)

---

[165] *Application of Nett*, 45 Ed. Dept. Rep., Decision No. 15,315.

190.    Policies enacted by the Board must ensure fiduciary responsibility as promulgated by State education laws and regulations. In furtherance of this requirement, the Board must implement and enforce those policies consistent with the letter and spirit of the law. Here, defendants failed to enforce and implement appropriate policies, and as such, breached their fiduciary duties as board members.

191.    By failing to "tak[e] reasonable steps to ascertain the value" of Hillcrest and Colton and not "utiliz[ing] a method of sale, which is apt to bring in the best price," the Board breached their "fiduciary duty to secure the best price obtainable in the board's judgment for any lawful use of the premises."[166]

192.    Defendants have further breached their fiduciary duty by diverting public funds to private religious institutions, by unnecessarily placing special education students in private schools, by losing the ability to gain state reimbursement for special education placement, by failing to engage in sound procurement practices, by failing to properly track library books loaned to private schools, by purchasing religious books with public funds, by cutting necessary educational programs, by showing a deliberate indifference to how the schools in the District are providing an education, by creating a segregated public school system, and by creating an environment of public distrust for the school board.

## AS AND FOR A EIGHTH
## CAUSE OF ACTION

### (VIOLATION OF EDUCATION LAW SECTION 3811)

193.    By all of their aforedescribed actions, defendants have abused the public trust, violating their fiduciary duty to both the taxpayers of the ERCSD and to the public school students of the ERCSD.

---

[166] *Appeal of White*, 50 Ed. Dept. Rep., Decision No. 16,239.

194.    On top of the aforedescribed waste of public money, defendants have spent hundreds of thousands, and perhaps millions of dollars defending these unlawful practices in actions brought by the State Education Commissioner, the Comptroller, the State Attorney General, and District parents, and an action brought by Plaintiffs herein, before the State Education Department, seeking the removal of defendants Daniel Schwartz, Yehuda Weissmandl, Moses Friedman, Moshe Hopstein, and Eliyahu Solomon.

195.    On or about July 17, 2012, the ERCSD Board agreed, by resolution, to invoke Public Officers Law §18 in response to a Petition brought by parents to remove Board members currently pending with the New York State Commissioner of Education. According to Section 3811, the District will provide for the defense of the Board members in this action if it "aris[es] out of any alleged act or omission which occurred or allegedly occurred while the employee was acting within the scope of [their] public employment or duties." Public Officers Law § 18 (3)(a).

196.    Similarly, Section 3811 provides that "whenever … any … member of the board of education of a school district … shall defend any action or proceeding … arising out of the exercise of his powers or the performance of his duties … all his *reasonable* costs and expenses, as well as all costs and damages adjudged against him, shall be a district charge … provided that … it shall be certified by the court of by the commissioner of education, as the case may be, that he appeared to have acted in good faith with respect to the exercise of his powers or the performance of his duties."

197.    At a Special Board meeting on July 17, 2012, called to discuss the Removal Petition pending with the New York State Commissioner of Education, an inquiry was made to determine if New York State Reciprocal Insurance ("NYICR") would cover attorneys' fees and other costs associated with defense of the Petition. In a subsequent meeting, the Board

reconvened and made the announcement that NYICR will not insure or cover Board Members for the costs associated with the Petition. Therefore, any and all costs, including attorney's fees will come out of District budget.

198.    A similar invocation of Pub. Off. Law 18 and N.Y. Educ. Law 3811 is expected for this case as well.

199.    The Board members should be denied the ability to invoke Pub. Off. Law 18 and N.Y. Educ. Law 3811, because Defendants used their position under the color of state law, to act unconstitutionally and with deliberate indifference to State law, and are charged with breaching their fiduciary duty to the District whose funds they want to tap for their self-defense.

200.    New York Education Law 3811 was created to protect District employees from being held liable for actions occurring within the scope of their employment. The actions of Board members as described in this complaint, are a complete departure from the intent and purpose of the indemnification protections of N.Y. Educ. Law 3811. Board actions which are unlawful, unconstitutional, and *ultra vires* should not be considered as actions arising out of the exercise of defendants' powers or the performance of their duties as board members for purposes of applying 3811.

201.    The Board members who are parties to this complaint and the Board members who were parties to the petition pending with the Commissioner of Education, have already been found to have violated State Education Law. Additionally, their actions to use public funds to support private religious interests in violation of the US Constitution is in direct conflict with the District's interest in maintaining a secular public school district with equal opportunities for all children in the district.

202.    Denial of reimbursements is supported by New York Commissioner of Education, Decision No. 12,584, where the Commissioner refused to "sanction the expenditure of public funds for the defense of a public officer or employee for misconduct committed in the exercise of his or her official duties" and stated that "[s]uch indemnification would serve as a deterrent to the bringing of disciplinary charges against the public officer or employee, which is contrary to the public interest."

203.    Here, such indemnification would serve as a deterrent for parent-plaintiffs from bringing charges against Board members for looting the District and damaging their children's futures because even more public funds would be diluted for the Board members' defense.

204.    It is against public policy for the School District to indemnify the School Board members for costs, attorneys' fees, and judgments that arise out of already established breaches of fiduciary duty to the District. State agencies have repeatedly cited the Board for violating NY State and Federal law.

205.    This is not a question of unknowing, negligent acts under the scope of an official's duties. Rather, Defendants' actions constitute a willful disregard and blatant misuse of public funds. Both NY Public Officers § 18 and NY Education § 3811 should not indemnify actions by Board members already found by the State to be improper.

206.    By acting as aforedescribed and by threatening to use School District funds to pay for the defense of this litigation, Defendants have breached and will continue to breach their fiduciary responsibilities and engage in a deliberate, blatant conversion of public funds.

## AS AND FOR A NINTH
## CAUSE OF ACTION

### (FRAUD)

207.   Defendants knowingly altered or directed to be altered, book purchase orders for religious textbooks.

      a.   In the purchase orders described in this complaint none of the books ordered have complete or accurate ISBN numbers listed.

          i.   ISBN numbers are 10 or 13 digit identifying number for a book. In purchase orders from East Ramapo, numbers listed are incomplete, some only providing six digits, making identification of the books difficult.

          ii.   Complete ISBN numbers listed are for different books.

          iii.   Titles are not searchable.

          iv.   Many of the listed titles are not in English

          v.   Some of them have ISBN codes but cannot be found on Internet search engines.

      b.   Additionally, the descriptions listed on the checks for these books are listed only as "textbooks and workbooks."

      c.   Defendants were members of the Board on the dates of the textbook invoices and after the Comptroller's report was issued.

      d.   Additionally, Defendants try to cover up their intent to order religious texts by including the phrases, "Do not send any books that violate NYS Textbook/Library Law. Only materials that are secular in nature can be accepted" Yet, the books ordered promote religion. This is direct evidence of intent to defraud taxpayers.

e.     Purchase orders also include the phrase, "Foreign language books must have an ISBN number on the book or the vendor must provide the English translation. Books without translation will not be accepted" This is an attempt by Defendants to cover their intent to buy books in Yiddish.

f.     Defendants made repeated misrepresentations on purchase orders, which they knew to be false with the intent of defrauding the plaintiff District. Plaintiffs relied on defendants to purchase books for the District in accordance with the law, which is justifiable in that the Defendants had a fiduciary relationship with the Plaintiffs to ensure compliance with Education Law and accordingly Plaintiffs experienced an injury.

208.   Defendants committed acts of fraud by misrepresenting property values in an attempt to sell public school property to Yeshivas.

a.     As discussed *supra*, the appraisal used by Defendants to value the Hillcrest school at $3.2 million set a value far below market rate for the property. This is because the appraisal compared the Hillcrest property to vacant land.

b.     As discussed *supra*, the appraisals used to evaluate Colton Elementary were far below market rate for the property.

c.     Defendants used the false appraisal and arbitrarily low appraisals in an attempt to sell the Hillcrest school and Colton Elementary to yeshivas quickly and without many other bids.

d.     Defendants used low appraisals despite also having appraisals or tax district assessments at much higher values for both properties.

e.     Defendants used this misrepresentation of fact, which they knew was false, with an intent to induce plaintiff District to rely upon it.

f.      Plaintiff District relied upon the decisions of Defendants to evaluate the property because of the fiduciary relationship between plaintiff and defendants. Defendants had a duty to make financial decisions in the best interest of the Plaintiffs and it was justifiable that the plaintiff District rely on the Defendants' representations in what they thought was furtherance of that duty.

g.      Plaintiff District lost funds as a result of this misrepresentation.

209.    Defendants have made misrepresentations of the residency of special education students, stating that student resided outside of the district were entitled to ERCSD placements, or have allowed such misrepresentations to be made.

210.    Upon information and belief, Defendants altered and misrepresented IEPs in order to secure private religious school placements of Jewish children in certain yeshivas.

211.    Defendants' actions as aforedescribed have cost the District hundreds of thousands, and perhaps millions of dollars.

## DAMAGES

212.    Plaintiff District has suffered a loss of millions of dollars, the exact sum of which is as yet unknown, as a direct and proximate result of the aforedescribed actions of defendants.

213.    Plaintiff parents and the children on whose behalf they sue have been deprived of educational opportunities to their damage in a sum as yet to be determined.

214.    Defendants have acted intentionally and recklessly, in total disregard of the rights of plaintiffs, the schoolchildren of East Ramapo Central School District, and the taxpayers of the East Ramapo Central School District, entitling plaintiffs to an award of punitive damages.

215.    The injury suffered by the School District, and by the children on whose behalf Plaintiffs sue, is irreparable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

A.      Enter a preliminary and permanent injunction:

      1.      Prohibiting the expenditure of District funds to defend this lawsuit or the appeal to the State Education Commissioner titled Jones *et al.* v. Schwartz, an action to compel the removal of five defendants herein from the School Board of the ERCSD;

      2.      Prohibiting the placement at District expense or continued placement of any child in a special education program not located in a public school of the ERCSD absent a showing, before a neutral hearing officer, that (a) the child resides in the district, and (b) the public school system in the ERCSD can attend to that child's special education needs.

      3.      Prohibiting the expenditure of ERCSD money on any textbook which is not entirely secular in nature.

      4.      Prohibiting contracts with any entity controlled by a religious institution to provide Title I services in any school in the District.

B.      Enter judgment:

      1.      Requiring restitution by defendants, jointly and severally, of all funds lost by the District as a result of the unlawful activities complained of in this Complaint.

      2.      To each plaintiff, and member of plaintiffs' class, in a sum to be determined, of a sum compensating that plaintiff's child for the loss of educational opportunities, and for punitive damages in the sum of $10 million.

      3.      Awarding plaintiffs attorneys' fees and costs, and such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiffs demand a jury trial on all claims.

Dated: August 7, 2012

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS

By:_____
           Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400


ADVOCATES FOR JUSTICE

By:_____
           Stephanie L. Torre
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400


ATTORNEYS FOR PLAINTIFFS

<u>**VERIFICATION**</u>

STEVE WHITE, a plaintiff herein, declares under penalty of perjury and verifies that the facts stated in the Complaint are true to my knowledge, and that I believe that the facts alleged, upon information and belief, are true.

Dated: August 6, 2012

_____
Steve White

## Exhibit List

Exhibit 1: Special Education Quality Assurance Monitoring Review Final Report Narrative

Exhibit 2: Notice to the East Ramapo Central School District Community of Noncompliance (February 2012)

Exhibit 3: Letter re: RISE- sent to Staff

Exhibit 4: ERSCD Contract w/ CEC (Signatory: Horowitz) - both Contracts 2011/2012

Exhibit 5: COC Brochure

Exhibit 6: YARC Certificate of Incorporation

Exhibit 7: Yeshiva Darchai Noam handbook

Exhibit 8: Letter from Office of Inspector General Closing Audit, December 13, 2011

Exhibit 9: Textbook purchase order FP 11-05351

Exhibit 10: Textbook purchase order BD12-02199 and BD12-01867

Exhibit 11: ERCSD Invoice/Credit Memo History For Customer Bais Malka School and various checks

Exhibit 12: ERCSD Board Meeting Minutes, April 19, 2010

Exhibit 13: Complaint from Steven White to John Katzenstein, New York State Attorney General (November 25, 2010)

Exhibit 14: Steve White, Verified Petition against sale of Hillcrest

Exhibit 15: Valuation Report for Hillcrest by Robert Forrest

Exhibit 16: ERCSD Board Meeting Minutes, August 29, 2011

Exhibit 17: ERCSD Board Meeting Minutes, April 22, 2009

Exhibit 18: ERCSD Board Meeting Minutes, May 6, 2009

Exhibit 19: ERCSD Board Meeting Minutes, July 15, 2009

Exhibit 20: Rider to Lease

Exhibit 21: ERCSD Board Meeting Minutes, May 25, 2011 (Sale of Colton Motion passed)

Exhibit 22: Contract of Sale of Colton between ERCSD and Bais Malka and HSAC

Exhibit 23: Request for Proposal

Exhibit 24: Journal News

Exhibit 25: Verified Petition of Brenda Carole Anderson

Exhibit 26: E-mail FOIL request from Luciano

Exhibit 27: Lease

Exhibit 28: NYSED document, "Building Projects on File".
http://www.nysed.gov/STATEAID/DIST/sa777/500402.html

Exhibit 29: Report of Examination - "East Ramapo Central School District, Internal Controls
Over Selected Financial Activities"(August 2011)

Exhibit 30: ERCSD Plan of Corrective Action, November 22, 2011

Exhibit 31: Board Policy No. 1740

Exhibit 32: Board Policy 5450

Exhibit 33: Board Policy No. 6700-R

Exhibit 34: 2010-11 Approved Budget, June 15, 2010

Exhibit 35: 2012-13 Adopted Budget, May 29, 2012

Exhibit 36: Board Policy No. 2560

Exhibit 37: Board Policy No. 6900

Exhibit 38: Comptroller's Audit - "School Districts' Procurement of Special Education
Professional Services" (December 2010)

Exhibit 39: Letter from Comptroller to ERCSD, December 13, 2010

Exhibit 40: ERSCD Board Meeting Minutes, November 18, 2009

Exhibit 41: ERSCD Board Meeting Minutes, December 1, 2009

Exhibit 42: ERCSD Board Meeting Minutes, December 2, 2009

Exhibit 43: ERCSD Board Meeting Minutes, February 1, 2010

Exhibit 44: ERCSD Board Meeting Minutes, February 2, 2010

Exhibit 45: ERCSD Board Meeting Minutes, February 3, 2010

Exhibit 46: NYCLU Letter, March 3, 2011

Exhibit 47: School Accountability Status for the 2011-12 School year (excerpts)

Exhibit 48: Cost Reduction Consensus Summary Sheet

Exhibit 49: Anti-Defamation League Letter, June 17, 2010

Exhibit 50: Comparable Sale #2; Town of Ramapo Records

Exhibit 51: Selected Regulations of the Commissioner of Education on Students with Disabilities

Exhibit 52: Affidavit of Joseph Meyer